William C. TOBIAS, Deborah Tobias, Danielle Tobias, a minor by her mother Deborah Tobias, Taylor Tobias, a minor by his mother Deborah Tobias, Plaintiffs,

v.

COUNTY OF PUTNAM, Thomas Velotti, Deputy Sheriff, individually and in his official capacity, Kevin Cargain, Deputy Sheriff, individually and in his official capacity, William Meyer, individually and in his official capacity, Gary Balunas, Carmel Balunas, Defendants.

No. 00 CIV. 6548(NRB).

United States District Court, S.D. New York.

March 14, 2002.

Anthony M. Giordano, Esq., Ossining, NY, for Plaintiffs.

Michael George Santangelo, Esq., White Plains, NY, for Defendants Velotti, Cargain, Meyer, and Putnam County.

Robert N. Palmer, Esq., Palmer & Gabel, Poughkeepsie, NY, for Gary and Carmel Balunas.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

The plaintiffs, all members of a single immediate family, bring this § 1983 action against three state law enforcement officers, two private citizens, and the County of Putnam, New York, for alleged violations of their civil rights. Following discovery, Deborah, Danielle, and Taylor Tobias withdrew all their claims,[1] and William Tobias withdrew his Fourth, Fifth, Eleventh, Twelfth and Fourteenth causes of action. See Letter from Anthony M. Giordano dated June 19, 2001. Before the Court are cross-motions for summary judgment.[2] As explained below, we dispose of these motions as follows: We grant summary judgment to Gary and Carmel Balunas and the County of Putnam on all claims against them, and we grant summary judgment to Deputy Sheriffs Thomas Velotti, Kevin Cargain, and William Meyer on all claims against them, except for the excessive force claims arising out of their attempts to handcuff Mr. Tobias and carry him to a patrol car.

## BACKGROUND

The basic facts of this case are not in dispute.[3] William and Deborah Tobias were married in 1988, but have lived apart since 1996. They were never legally separated or divorced, and during the relevant time period (early July 1999), Mrs. Tobias lived with their two minor children in a relatively rural part of Putnam County, New York, while Mr. Tobias maintained an independent residence approximately twenty miles away, in Katonah, New York. At that time, Mrs. Tobias worked for defendants Gary and Carmel Balunas and, as part of her compensation, was permitted to live with her children in a small house (the "cottage") owned by the Balunases. The Balunases owned a large parcel of land, on which there are several single-family houses, including the cottage, were built. The cottage is located about fifty to one hundred yards away from the house in which the Balunases themselves lived.

Mrs. Tobias began her employment with the Balunases and moved into the cottage on or about January 18, 1999. During the first few weeks of the arrangement, Mr. Tobias lived at the cottage along with his wife and children. In February 1999, however, Mr. Balunas explicitly and emphatically told Mrs. Tobias that Mr. Tobias was no longer allowed to live in the cottage and, furthermore, that the Balunases did not want him on the property at all.[4] Mrs.

---

1. While most of the causes of action were brought collectively by all plaintiffs, the Thirteenth cause of action was brought solely by Deborah, Danielle, and Taylor Tobias. Accordingly, that cause of action is withdrawn in its entirety.

2. Gary and Carmel Balunas are represented by a different law firm than the other defendants. The Balunases have made no motions before this Court.

3. During discovery, the parties took the depositions of Mr. and Mrs. Tobias, Deputy Sheriffs Velotti, Cargain, and Meyer, as well as non-party Ronald Graves. The testimony elicited was, for the most part, consistent among all deponents. Accordingly, while we make no findings of fact, we accept the agreed upon facts as true for purposes of the present motions, and we note herein any instances where the deponents' versions of the facts diverge.

4. Mr. Tobias and Mr. Balunas were, at one time, friendly acquaintances. They had known each other for eight years, were members of the same church, which they had both helped construct, and Mr. Tobias had attended Mr. Balunas's wedding. W. Tobias Dep. at 13:25–14:20. This relationship evidently soured, however, prior to the events from which this suit arises. See D. Tobias Dep. at 6:25–7:6.

Tobias relayed this message to Mr. Tobias, who promptly moved out. W. Tobias Dep. at 16:20–21. For the next several months, however, Mr. Tobias frequently (and perhaps surreptitiously) visited his family at the cottage against the clear wishes of the Balunases of which he was aware.

On July 2, 1999, Mr. Balunas telephoned the police to make a complaint against Mr. Tobias. Defendants Deputy Sheriffs Thomas Velotti and Kevin Cargain of the Putnam County Sheriff's Department ("PCSD") drove to the Balunases' house to investigate the matter. They interviewed Mr. Balunas, who told them that he had learned that Mr. Tobias was present at the cottage, and thereafter had spoken to him on the telephone[5] and requested that he leave the premises. According to Mr. Balunas, Mr. Tobias threatened him by replying, "You better watch your back, I'll be back for you." Velotti Dep. at 35:14–15. We note that Mr. and Mrs. Tobias testified in their deposition that Mr. Tobias did not speak, on the telephone or otherwise, with Mr. Balunas on that date. W. Tobias Dep. at 16:9–11, 22:2–22; D. Tobias Dep. at 12:10–13:5. Mr. Balunas declined to file criminal charges against Mr. Tobias at that time.

Deputy Sheriffs Velotti and Cargain then went to the cottage to interview Mr. Tobias. Mrs. Tobias spoke with the officers and told them that he was not present at the cottage or in the area, and that there was no cause for concern. W. Tobias Dep. at 23:3–9. As Mr. Tobias was familiar with several members of the PCSD,[6] he called them to inquire into the investigation of his alleged threat. He spoke with William Porteus, an officer with whom he was acquainted, who recommended that Mr. Tobias stay away from the cottage and Mr. Balunas "[t]o avoid problems." *Id.* at 24:22.

Mr. Tobias did not stay away for long, however, and on the afternoon of July 7, 1999, he went to the cottage to deliver child support and to take his wife and children swimming. D. Tobias Dep. at 14:16–15:3. The Balunases, apparently fed up with Mr. Tobias's behavior,[7] called the PCSD and requested that they come and

---

**5.** Mr. Tobias apparently initiated the phone call. *See* Velotti Dep. at 34:2–16.

**6.** Prior to the incidents in question, Mr. Tobias had had numerous opportunities to become acquainted with law enforcement officers in and around Putnam County. He had two prior felony convictions for driving while intoxicated, one in 1994, for which he received a prison sentence, and one in 1996, for which he received six months probation. He was also convicted of Attempted Assault in the Second Degree in 1996, a felony, for which he received a sentence of one and one-half to three years in state prison. In 1992, he pleaded guilty to issuing a bad check, and paid the amount due. Also, after the events at issue here, he pleaded guilty to driving under the influence. *See* W. Tobias Dep. at 17:23–21:21. Furthermore, initially on his own accord, later in exchange for a lesser sentence for one of his DWI felony convictions, he assisted the PCSD by arranging to buy illicit drugs from tenants in a welfare hotel, who would then be arrested for narcotics violations by the PCSD. *Id.* at 24:23–26:19. As such, he was personally acquainted with several people in the Sheriff's Department, and others in the Department knew of him by name. *Id.* at 23:5; Velotti Dep. at 51:14–53:11.

**7.** Mrs. Tobias had also fallen out of favor with the Balunases by this time. As the complaint admits, prior to July 7, 1999, the Balunases had "terminated [Mrs. Tobias's] employment and were seeking to remove her and her family from the property expeditiously." Compl. ¶ 21. Mr. Balunas had apparently fired her because he believed that she had deleted important files and stolen valuable information from his office computers. *See* D. Tobias Dep. at 13:6–13; Velotti Dep. at 27:18–25. As her right to live in the cottage was part of her employment compensation, it appears that when she was fired, her "tenancy" was terminated as well.

remove Mr. Tobias from his property because he was trespassing.

Deputy Sheriffs Velotti and Cargain again drove to the Balunases' house and investigated this second complaint. The Balunases again told the Deputy Sheriffs that Mr. Tobias was trespassing on their property (the cottage) and that they did not want him there. The Deputy Sheriffs then went to the cottage. As they walked by the cottage's bay window, Mr. Tobias noticed them, then exited the cottage and asked if he could help them. W. Tobias Dep. at 38:5–8. The Deputy Sheriffs testified that, based on their observations, Mr. Tobias seemed to be significantly intoxicated. Cargain Dep. at 23:11–22; Velotti Dep. at 53:12–54:4. Although Mr. Tobias admits that he "poured [him]self a cocktail" shortly before the Deputy Sheriffs arrived at the cottage, W. Tobias Dep. at 12:8–9, the Tobiases deny that he was intoxicated. *Id.* at 13:4–7; D. Tobias Dep. at 16:2–3.

The Deputy Sheriffs told him that they had a trespassing complaint from Mr. Balunas, and Mr. Tobias responded, "Fuck [Mr. Balunas]. He's an asshole. He just don't like me."[8] W. Tobias Dep. at 38:21–39:3. Mrs. Tobias testified that, at about this time, she informed the Deputy Sheriffs that she was the legal tenant of the cottage and that Mr. Tobias had her permission to be on the premises. D. Tobias Dep. at 17:10–16. Deputy Sheriff Cargain took Mrs. Tobias aside, and Deputy Sheriff Velotti told Mr. Tobias, "Well, let's get in the car and talk about this." W. Tobias Dep. at 39:17–18. The Deputy Sheriffs told Mr. Tobias that they were merely investigating a complaint, and explicitly informed him that he was not under arrest.

*Id.* at 41:11–20. Mr. Tobias responded by saying, "We can talk about this all day, but unless I'm under arrest I'm not getting in the fucking [patrol] car."[9] *Id.* at 40:8–10.

At this point, the defendants' and the plaintiff's versions of the facts begin to differ significantly. According to Mr. Tobias, Deputy Sheriff Velotti "made a crazy face and reached for something on his belt," which he believed to be possibly pepper spray or a club. *Id.* at 40:12–13, 42:5–6. The defendants deny this in its entirety, and Deputy Sheriff Cargain testified that Mr. Tobias stated, "Come and get me[,] motherfucker," and "None of you guys can catch me. I'm too fast for you." Cargain Dep. at 28:6–8. Both sides agree, however, that moments after Mr. Tobias refused to get in the patrol car, he ran away from the Deputy Sheriffs and into the nearby woods. The Deputy Sheriffs made a brief attempt to catch Mr. Tobias, but were unsuccessful. They then went back to the Balunases' house to take further information regarding the trespass complaint.

While the Deputy Sheriffs were speaking to Mr. Balunas, Mr. Tobias sneaked back from the woods and hid in a crawl space under the cottage. W. Tobias Dep. 42:24–25. Upon realizing that the Deputy Sheriffs were at the Balunases' house, and that, therefore, it was safe to come out of hiding. Mr. Tobias went inside the cottage and called PCSD headquarters, apparently hoping to speak with someone he knew from his undercover narcotics work. *Id.* at 43:14–24. He spoke to the receptionist for the narcotics unit, who told him, "Billy, what the heck are you doing? Just surrender yourself and we'll straighten

---

**8.** Deputy Sheriff Velotti testified that William Tobias added, "And if I get the opportunity, I'm gonna hurt him." Velotti Dep. at 54:10–13. Mr. Tobias denies making this statement. W. Tobias Dep. at 41:4–7.

**9.** Deputy Sheriff Cargain testified that Mr. Tobias assumed a "fighter's stance" when he refused to get in the patrol car. Cargain Dep. at 28:5–6.

this out when you get down here." *Id.* at 44:8–11.

Mr. Tobias then went outside the cottage and hid behind a large tree. He testified that when he saw one of the Deputy Sheriffs returning from the Balunases' house, he stepped out from behind the tree "in a position of surrender" and "with [his] hands open" to show that he was unarmed. *Id.* at 46:18–20. Mrs. Tobias testified that when he came out from behind the tree, his hands were "out at his sides." D. Tobias Dep. at 25:7. Ronald Graves, a non-party neighbor, testified that Mr. Tobias had his hands "down to his side" at this time, and that at no point did he "have his hands raised up in the air as if to surrender." Graves Dep. at 16–23.

Upon spotting Mr. Tobias, the Deputy Sheriffs ran towards him, whereupon he again began running away from them and towards the woods. En route, however, he slipped on the wet grass under a volleyball net located on the property. The Deputy Sheriffs caught up to him and informed him that he was under arrest for disorderly conduct. According to Deputy Sheriff Velotti, Mr. Tobias "put his hands up[,] made fists[, and] said, 'Take it to me.'" Velotti Dep. 24:25–25:2. According to Deputy Sheriff Cargain, Mr. Tobias assumed a "fighter's stance" and said, "I'm a violent motherfucker. Come and get me." Cargain Dep. at 37:18–38:3. Deputy Sheriff Cargain then sprayed Mr. Tobias in the face with pepper spray. *Id.* at 38:3–4.

There is again a significant factual dispute over what exactly transpired at this point. Deputy Sheriff William Meyer, who responded to a call for assistance from Deputy Sheriffs Velotti and Cargain, arrived on the scene at this time, and testified that the first thing he saw was Mr. Tobias "fighting with the two Deputy Sheriffs." Meyer Dep. at 16:23–24. Specifically, Deputy Sheriff Meyer testified that Mr. Tobias was, in several different positions, "struggling, screaming, [and] yelling" and that he was "punching" the Deputy Sheriffs. *Id.* at 17:3–18:6. Deputy Sheriff Velotti testified that Mr. Tobias was "fighting, punching, biting" and that he feared for his own safety. Velotti Dep. at 11:25–12:3. He also stated that Mr. Tobias kicked him in the upper thigh. *Id.* at 46:11–14. Deputy Sheriff Cargain testified, *inter alia*, that Mr. Tobias bit his hand as he tried to handcuff him. Cargain Dep. at 10:19–25, 20:17–21. Mr. Tobias testified that he did not intentionally punch or kick any of the Deputy Sheriffs, W. Tobias Dep. at 52:7–11, 51:23–24, but he stated that he was "struggling to get up" off the ground by "trying to roll the officer[s] off my back," *Id.* at 51:11, and that "[i]f there was somebody behind me there and I was thrashing, he might have got caught with a foot." *Id.* at 52:4–6. He also testified that his arms were stuck under him as he struggled. *Id.* at 52:10–11. Mrs. Tobias testified that Mr. Tobias "was trying to just stop the beating," but did not "intentionally kick[ ] anyone." D. Tobias Dep. at 27:3–10. It is undisputed, however, that Deputy Sheriff Cargain punched Mr. Tobias three times in the back of the head in reaction to being bitten by him.[10] Cargain Dep. at 20:20–22, 9:7–9; Velotti Dep. at 22:6–7.

Eventually, the Deputy Sheriffs handcuffed Mr. Tobias with his hands behind his back. Deputy Sheriff Velotti told Mr. Tobias that they were going to pick him up and bring him to the patrol car, but Mr. Tobias continued to struggle and fight. Velotti Dep. at 44:12–45:21; Meyer Dep. at 23:9–14. The Deputy Sheriffs testified

---

**10.** As noted above, the plaintiffs deny that Mr. Tobias bit Deputy Sheriff Cargain. Deputy Sheriff Cargain, however, is adamant that Mr. Tobias's bite caused the puncture wounds on his hand, the existence of which are undisputed. Cargain Dep. at 9:7–12:9.

that, even though Mr. Tobias was handcuffed, they were unable to restrain him, he continued to kick and flail, and, therefore, they feared for their own safety and for the safety of the Balunases. *Id.* at 11:24–12:4; Cargain Dep. at 26:11–14; Meyer Dep. at 29:11–12. Mr. Graves's testimony strongly supports this characterization. *See* Graves Dep. at 29:13–30:7, 33:4–5. In his deposition, Mr. Tobias testified that after he was handcuffed, he "may have thrashed around a little bit," and acknowledged that he was violently resisting the Deputy Sheriffs' attempts to restrain him and place him in the patrol car. W. Tobias Dep. at 54:6–8; *see also id.* at 51:11–15 (he was "[r]olling, trying to get the officer off [his] back"); *id.* at 52:4–6 (an officer "might have got caught with a foot"); *id.* at 59:7–8 (he "surrendered" only after he was placed in the patrol car). Mrs. Tobias denied that Mr. Tobias intentionally kicked anyone, but admitted that he was "moving to try to get free" from the Deputy Sheriffs. D. Tobias Dep. at 27:5–10.

In order to control Mr. Tobias, Deputy Sheriff Velotti decided that they should tie his arms and legs together with a rope. Velotti Dep. at 10:9–11. Accordingly, the three Deputy Sheriffs tied Mr. Tobias's feet together, then tied his feet to his hands behind his back.[11] *Id.;* W. Tobias Dep. at 55:7–9. His feet were about two feet from his hands. Velotti Dep. at 11:20–21. It is undisputed that Mr. Tobias was carried by the Deputy Sheriffs to the patrol car while tied in a four-point restraint. Mr. Tobias contends, however, that he was "dragged, picked up, dropped,

bounced," and then thrown into the patrol car. W. Tobias Dep. at 55:20–23. Mrs. Tobias testified that the Deputy Sheriffs "picked [Mr. Tobias] up and dragged him onto the pavement. Then they dropped him. He caught the full blow in his chest as his head was pulled back from his body by the force of the rope and his legs. They dragged him a few more feet and then they dragged him up the stairs, bouncing on the way." D. Tobias Dep. at 28:13–19. The defendants deny dropping Mr. Tobias as they brought him to the patrol car. Meyer Dep. at 34:19.

The Deputy Sheriffs then drove Mr. Tobias to the Sheriff's Department, whereupon the ropes that bound him were removed. W. Tobias Dep. at 59:9–11. Mr. Tobias spent several days in jail following these events.

## DISCUSSION

### I. Causes of Action

For the sake of clarity, we set out the causes of action that remain in this case.[12]

Mr. Tobias brings three classes of claims for violations of his rights under the United States Constitution pursuant to 42 U.S.C. § 1983. He brings claims against Deputy Sheriffs Velotti, Cargain, and Meyer (collectively, the "officer defendants"); against the Balunases; and against the County of Putnam ("the County").

Mr. Tobias asserts six claims against the officer defendants, alleging violations of his rights under the First, Fourth, Eighth, and Fourteenth Amendments: first, that they entered and searched the cottage

---

11. The defendants refer to the resulting configuration as a "four-point restraint," while the plaintiffs use the term "hog-tie." We will use the defendants' terminology herein, as this is the official terminology of the PCSD. Meyer Dep. at 31:23–25.

12. As noted at the outset, three plaintiffs and several causes of action are no longer part of this action. Accordingly, we discuss only the causes of action that remain, all of which are brought solely by Mr. Tobias. We have reorganized Mr. Tobias's claims from their presentation in his complaint in order to separate the strands of his various allegations.

premises without lawful right, warrant, or just cause to do so; second, that they unlawfully detained and arrested him; third, that they maliciously prosecuted him, subjected him to malicious abuse of process, and falsely imprisoned him; fourth, that they used unnecessary and excessive force in arresting him; fifth, that they showed deliberate indifference to his medical needs; and sixth, that his arrest was retaliation for the exercise of his First Amendment right to free speech.

His claims against the Balunases are not clearly laid out as causes of action, but his complaint can fairly be read to assert a § 1983 claim against them, alleging that the Balunases entered into and carried out a conspiracy, along with the officer defendants, to violate his civil rights by making false complaints against him in order to have him arrested. Compl. ¶ 3.

Finally, he claims that the policies and practices of the County of Putnam ("the County") violated his First, Fourth, and Fourteenth Amendment rights. *Id.* ¶ 78. The allegedly unlawful policies and practices include using unnecessary and excessive force upon individuals targeted by deputy sheriffs; using the four-point restraint; arresting individuals without probable cause and subjecting them to malicious prosecution, investigation, abuse of process, excessive force, and assault and battery. *Id.* ¶ 68.[13]

## II. Summary Judgment Standard

The officer defendants and the County of Putnam have moved for summary judg-ment on all claims against them. Mr. Tobias has cross-moved for summary judgment against both of these defendants. The Balunases have made no motions before this Court, but, as explained below, we reach the claims against them as well. We apply the familiar summary judgment standard of Federal Rule of Civil Procedure 56(c) to the present motions. *See, e.g., Pappas v. Giuliani,* 118 F.Supp.2d 433, 436–37 (S.D.N.Y.2000). We note, however, that when cross-motions for summary judgment are made, as here, the standard is the same as that for individual motions for summary judgment. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). Each motion is considered independently of the other and, when evaluating each, we consider the facts in the light most favorable to the non-moving party. *Id.*

## III. Claims Against the Officer Defendants

### A. Unlawful Entry and Search of the Cottage Grounds

Mr. Tobias asserts that the officer defendants violated his Fourth Amendment rights by entering the cottage grounds[14] and searching for him there. Because he lacks standing to bring this claim, and because, even if he had standing, the search was lawful, we grant the officer defendants summary judgment on this claim.

"[I]n order to claim the protection of the Fourth Amendment, a defendant must

---

**13.** Mr. Tobias also brings claims under the laws of New York State. First, he claims that the officer defendants violated his rights as guaranteed by New York State law by detaining and arresting him without probable cause, falsely arresting and imprisoning him, and subjecting him to malicious prosecution and abuse of criminal process. Compl. ¶ 75. Second, he claims that he was assaulted and battered, presumably by the officer defen-dants. *Id.* ¶ 89. These claims do not appear to state causes of action distinct from those brought under § 1983. Accordingly, we discuss only the § 1983 claims, as the disposition of those claims necessarily resolves the state law claims.

**14.** It is undisputed that the officer defendants never actually entered the cottage.

demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). In applying this analysis, the first question to ask is "whether the defendant had any property or possessory interest in the place searched." *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991). Thus, while "an overnight guest in a home may claim the protection of the Fourth Amendment, . . . one who is merely present with the consent of the householder may not." *Id.* at 90.

█ Here, Mr. Tobias was invited to the cottage by Mrs. Tobias, but expressly barred from the premises by the owners of the cottage, the Balunases. Whether or not he was literally trespassing, we cannot say that he had a *reasonable* expectation of privacy there. He had his own apartment in a different town, and did not live at the cottage. W. Tobias Dep. at 11:8–14. Second, he was not an overnight guest of Mrs. Tobias. Finally, he was well aware that the Balunases were willing to call the police in order to keep him away from the premises. In short, he lacks standing to challenge the lawfulness of the search of the cottage grounds.[15]

## B. Unlawful Detention and Arrest

█ It is undisputed that the officer defendants lacked a warrant when they arrived at the cottage. Thus, the issue of whether Mr. Tobias's detention and arrest were constitutional turns on whether the officer defendants had probable cause to detain and arrest him at the time they did so. *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000). The officer defendants may be, however, protected by qualified immunity, and thereby shielded from civil

damages liability arising out of performance of their discretionary functions, so long as their actions were objectively reasonable "in light of the legal rules that were 'clearly established'" when they acted. *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, we must determine whether the officer defendants' belief that they had probable cause was objectively reasonable on July 7, 1999. Because we answer this question in the affirmative, we grant the officer defendants summary judgment on this claim.

Probable cause is "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Simonetti,* 202 F.3d at 634. Moreover, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Miloslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1534 (2d Cir.1993). Finally, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Simonetti,* 202 F.3d at 634. In the case *sub judice,* the officer defendants claim that probable cause existed to arrest Mr. Tobias for trespass, N.Y. Penal § 140.05, disorderly conduct, *id.* § 240.20, and harassment, *id.* § 240.26.

With respect to trespassing, the Balunases made two complaints to the officer defendants that Mr. Tobias was trespassing on their property. There is a dispute between the parties as to whether Mr. Tobias violated the New York trespass statute by going to the cottage with per-

---

**15.** Moreover, as discussed *infra, see* Part III.B, the officer defendants had probable cause to arrest Mr. Tobias for several crimes when they arrived at the cottage. Therefore, even if Mr. Tobias did have standing to challenge this search, such challenge would fail.

mission from Mrs. Tobias, when Mr. Balunas had expressly banned him from the property. Fortunately, we need not concern ourselves with the niceties of New York property and landlord-tenant law. Under the test outlined above, it was clearly objectively reasonable for the officer defendants to believe that Mr. Tobias was trespassing because the owners of the property, the Balunases, had notified him that he was not permitted to visit the cottage. *See People v. Licata,* 28 N.Y.2d 113, 320 N.Y.S.2d 53, 268 N.E.2d 787 (1971) (criminal defendant who had previously been notified that he was barred from horse racetrack violated § 140.05 when he returned to the racetrack). Whether or not the criminal trespassing charge would have led to an indictment or a conviction is of no moment. It is sufficient for the officer defendants to show that they had arguable probable cause to believe that Mr. Tobias was committing a trespass. They have sustained this burden.[16]

Moreover, the officer defendants also had arguable probable cause to arrest Mr. Tobias for harassment in the second degree. *See* N.Y. Penal § 240.26.[17] On July 2, 1999, Mr. Balunas told Deputy Sheriff Velotti that Mr. Tobias had threatened him by saying, "You better watch your back, I'll be back for you," in response to a request that he leave the cottage. Velotti Dep. at 35:14–15. Five days later, according to Deputy Sheriff Velotti, Mr. Tobias stated that, "if I get the opportunity, I'm gonna hurt [Mr. Balunas]." Velotti Dep. at 54:10–13. These statements gave the officer defendants probable cause to believe that Mr. Tobias threatened Mr. Balunas with intent to alarm him, in violation of § 240.26(1).

■ Finally, the officer defendants had probable cause to arrest him for disorderly conduct. *See* N.Y. Penal § 240.20. Under New York law, criminal harassment coupled with an "intent to cause public inconvenience, annoyance, or alarm or a reckless risk thereof" can constitute disorderly conduct. *People v. Deignan,* 116 Misc.2d 955, 457 N.Y.S.2d 378, 381 (1982). Thus, as the officer defendants had probable cause to arrest Mr. Tobias for harassment, they likewise had probable cause to arrest him for disorderly conduct, so long as it

16. Plaintiff adamantly claims that, because the officer defendants knew that Mrs. Tobias lived in the cottage and had invited Mr. Tobias to be there, this shows that any belief that Mr. Tobias had committed a trespass was unreasonable, and therefore, that his arrest must have been the product of malice. Pl.'s Mem. at 8–9. Even under the version of the facts most favorable to the plaintiff, namely, that the officer defendants were fully aware that Mrs. Tobias had invited Mr. Tobias to the cottage, we find that the officer defendants had arguable probable cause to arrest him for trespass. We so find because New York law is not entirely clear as to whether the "license" Mrs. Tobias granted to Mr. Tobias was legally effective, because her right to live in the cottage constituted compensation for her employment by Mr. Balunas, which had come to an end before the events at issue here, and because the Balunases arguably had the right to place conditions on the use of the cottage by Mrs. Tobias. As the officer defendants could have been unsure whether Mr. Tobias's actions constituted a trespass under New York law, yet still arrested him on the ground that there was a non-frivolous argument that he had trespassed, their qualified immunity is not forfeited by their doing so.

17. "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:

 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or

 2. He or she follows a person in or about a public place or places; or

 3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."

was reasonable for them to believe that he had the requisite intent. We find that such a belief is reasonable, in light of the fact that Mr. Tobias spoke to the officer defendants in front of the cottage, peppered his argument with profanities, made a significant spectacle, and attracted the attention at least one neighbor, Mr. Graves. *See People v. Santora*, 209 N.Y.S.2d 499, 500 (1961) (evidence that defendant used "vile, profane and abusive" language toward a police officer, resulting in neighbors leaving their front porches and approaching the officer, sustained disorderly conduct conviction). Thus, the officer defendants had arguable probable cause to arrest Mr. Tobias for disorderly conduct.

In short, the officer defendants clearly had arguable probable cause to arrest Mr. Tobias for any one of these three crimes from the moment they arrived at the cottage on July 7, 1999. Accordingly, they are immune from suit on this claim, and we grant summary judgment in their favor.

## C. Malicious Prosecution, Malicious Abuse of Process, and False Imprisonment

■ Mr. Tobias's claims for malicious prosecution, false imprisonment, and abuse of process are cognizable under § 1983, and we look to state law to determine the elements of these causes of action. "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun malice and,(4) the matter terminated in plaintiff's favor." *Ricciuti v. New York City Transit Auth.*,

124 F.3d 123, 130 (2d Cir.1997). "[A] malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir.1994). Finally, a "prima facie case of the intentional tort of false imprisonment is established upon a showing that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff did not consent to the confinement; (3) the plaintiff was aware that he was confined; and (4) the confinement was not otherwise privileged, such as confinement pursuant to a warrant or with probable cause or immunity protection." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998). Mr. Tobias's claims arise out the several days he spent in jail following the events of July 7, 1999, as well as a criminal prosecution for assault, resisting arrest, disorderly conduct, and trespass.[18] *See* Giordano Aff., Ex. H.

■ With respect to the malicious prosecution claim, if the officer defendants had probable cause to arrest him for the crimes with which he was eventually charged, his claim must fail. *Lacey v. Daly*, 2002 WL 4570, at *1, 26 Fed.Appx. 66 (2d Cir.2001). We have already determined that the officer defendants had probable cause to arrest Mr. Tobias for trespass, harassment, and disorderly conduct. *See* Part III.B, *supra*. Once Mr. Tobias ran away and fought against the officer defendants as they tried to arrest and restrain him, they had probable cause to arrest him for assault and resisting

---

**18.** The parties agree that these charges were dropped by the prosecutor in exchange for a guilty plea to a D.W.I. charge. *See* W. Tobias Dep. at 28:15–29:3 (colloquy between counsel). Mr. Tobias was sentenced to and served six months in prison for the D.W.I. offense. *Id.* at 29:4–9.

arrest. Accordingly, we grant the officer defendants summary judgment on the malicious prosecution claim.

■■■ As for the malicious abuse of process claim, we observe that "malicious prosecution and abuse of process are closely allied. While malicious prosecution concerns the improper issuance of process, '[t]he gist of abuse of process is the improper use of process after it is regularly issued.'" *Cook*, 41 F.3d at 80 (quoting 2 Committee on Pattern Jury Instructions, Association of Supreme Court Justices, New York Pattern Jury Instructions § 3:51 at 816 (1968)). We have just determined that the prosecution of Mr. Tobias was begun lawfully and without malice. Mr. Tobias has not put forth any evidence whatsoever to show that the officer defendants' conduct became malicious at some time after he was arraigned, and the officer defendants deny any such malice. Hence, we grant summary judgment for the officer defendants on the malicious abuse of process claim.

Finally, as Mr. Tobias was jailed "with probable cause,"his false imprisonment claim fails. *Curley*, 153 F.3d at 13. In conclusion, we grant summary judgment to the officer defendants on these three related claims.

### D. Excessive Force

Mr. Tobias claims that the officer defendants used excessive force in arresting him. His complaint, fairly read, asserts three distinct excessive force claims: First, that they used excessive force in attempting to restrain him from the time he slipped on the wet grass until he was handcuffed; second, that tying him in the four-point restraint was excessive force in and of itself; and third, that dropping him as they carried him to the patrol car in the four-point restraint constituted excessive force. The officer defendants assert the defense of qualified immunity.

The Supreme Court has recently set out an analytical approach to be used for claims such as these. *See Saucier v. Katz*, 533 U.S. 194, 199–200, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001). Under *Saucier*, we must consider the following two questions, in order: first, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer[s'] conduct violated a constitutional right?"; and second, if so, was the right "clearly established" when the allegedly unconstitutional act was taken? *Id.* at 200–01, 121 S.Ct. at 2156. To answer the first question, we find that, taking the facts in the light most favorable to Mr. Tobias, the first and third instances could constitute excessive force in violation of the Fourth Amendment, but that the second did not. Furthermore, the right at issue in the first and third instance was clearly established on July 7, 1999. Accordingly, these two claims survive the officer defendants' summary judgment motion, but, as significant factual disputes remain, we also deny Mr. Tobias's summary judgment motion on these claims.

### 1. Excessive Force Standard

We analyze Mr. Tobias's excessive force claims under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Application of this standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865. We observe that this evaluation must be made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and with an awareness that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolv-

ing—about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. 1865. Using this legal standard, we now turn to the *Saucier* analysis of each of Mr. Tobias's excessive force claims.

### 2. *Saucier* Analysis

#### a. Activity Before the Handcuffing of Mr. Tobias

 Mr. and Mrs. Tobias testified in their depositions that the officer defendants beat Mr. Tobias in their attempt to handcuff him. The Tobiases acknowledge that he was squirming, but they deny that he intentionally kicked or punched any of the officer defendants. Moreover, the officer defendants admit that Deputy Sheriff Cargain punched Mr. Tobias in the head three times in response to an apparent bite of his hand. If we assume these facts to be true, the officer defendants' use of force could be found to be excessive and disproportionate to the threat posed by Mr. Tobias. Moreover, there can be no doubt that Mr. Tobias's right to be free from this type of excessive force was clearly established on July 7, 1999. *See, e.g., Breen v. Garrison,* 169 F.3d 152 (2d Cir.1999). Due to the significant dispute over material facts,[19] however, we cannot award summary judgment to either party.

#### b. Four–Point Restraint

 It is undisputed that the officer defendants placed Mr. Tobias in a four-point restraint using handcuffs and rope. Moreover, it is undisputed that Mr. Tobias was struggling against the officer defendants even after being handcuffed. *See* W. Tobias Dep. at 59:7–8 (stating that, after being placed in the patrol car, he finally "surrendered"); Velotti Dep. at 11:24–12:5 (the four-point restraint was used because

Mr. Tobias "was fighting, punching, kicking, biting and three of us that were on the scene were unable to restrain him and we felt for our safety and the safety of the Balunases, who he had threatened, that we had no option but to tie him to get him to our patrol vehicle"). Finally, although the officer defendants testified that they believed Mr. Tobias to be intoxicated, Mr. and Mrs. Tobias both testified that he was sober. We find that the use of the four-point restraint, in and of itself, was not an excessive use of force.

*Price v. County of San Diego,* a recent district court case, includes an extensive discussion on the physiological impact of the four-point restraint. 990 F.Supp. 1230, 1237–38 (S.D.Cal.1998). In *Price,* a suspect was arrested and bound in a four-point restraint. He died shortly thereafter. His family and estate sued the police officers who had arrested him alleging, *inter alia,* that they had used excessive force by using the four-point restraint. They engaged as an expert Dr. Donald T. Reay, who had studied the combined effects of exercise (such as struggling with police) and the four-point restraint. *Id.* at 1237. He had previously concluded that this combination causes blood oxygen levels to decrease and remain at an unhealthy level, and so testified. *Id* The defendants engaged Dr. Thomas Neuman to conduct a sophisticated study to revisit Dr. Reay's prior research and conclusions. *Id.* Dr. Neuman found that while the four-point restraint "impairs the mechanical process of inhaling and exhaling," the impairment is "so minor that it ... has no practical significance." *Id.* at 1237–1238.

Thus, Dr. Neuman's study "eviscerate[d] Dr. Reay's conclusions." *Id.* at 1238. "Dr. Neuman explained the disparity between his findings and those of Dr. Reay

---

19. The officer defendants claim that Mr. Tobias was kicking, punching, and biting them as they tried to handcuff him, and that they used

only the amount of force that was necessary to safely restrain and arrest him.

by describing methodological flaws in Dr. Reay's experiments and logical flaws in Dr. Reay's reasoning." *Id.* In light of this, Dr. Reay conceded that the four-point restraint is " 'physiologically neutral,' " or, in other words, has no adverse physical impact on someone who is subjected to it. *Id.* As nearly all the evidence of the physiological dangers of the four-point restraint grew out of Dr. Reay's work, the *Price* court concluded that the use of the four-point restraint, in and of itself, does not constitute excessive force.[20] *Id.*

Since *Price,* no court has challenged this conclusion, and at least one has endorsed its findings. *See Sims v. Greenville Cty.,* 2000 WL 380122, at *3 n. 6, 211 F.3d 1265 (4th Cir.2000). Several courts have distinguished *Price* by holding that the four-point restraint does constitute excessive force when used on an individual whose is suffering some significant "diminished capacity." *See Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183, 1186, 1188 (10th Cir. 2001) ("large amount of cocaine" in system); *Gutierrez v. City of San Antonio,* 139 F.3d 441, 451 (5th Cir.1998) ("drug-affected person in a state of excited delirium").

We find that, due to the absence of any significant diminished capacity on the part of Mr. Tobias,[21] the officer defendants' use of the four-point restraint did not, in and of itself, constitute excessive force. In addition, we note that Mr. Tobias does not claim that he complained to the officer defendants about their use of the four-

point restraint. W. Tobias Dep. at 55:23–24; Velotti Dep. at 12:21–25. In short, the officer defendants are shielded by qualified immunity because their conduct did not constitute an excessive force violation of the Fourth Amendment. We therefore grant them summary judgment on this claim.

### c. The Carrying of Mr. Tobias

█ Mr. and Mrs. Tobias testified that the officer defendant's dragged, dropped, and bounced Mr. Tobias as they brought him to the patrol car. W. Tobias Dep. at 55:20–23; D. Tobias Dep. at 28:13–19. Deputy Sheriff Meyer testified, however, that when Deputy Sheriffs Velotti and Cargain carried Mr. Tobias to the patrol car, they kept him "fully in the air [with his] body completely up off the ground." Meyer Dep. at 34:6–7. Viewing the facts in the light most favorable to Mr. Tobias, however, they could form the basis of a claim that the intentional dropping of Mr. Tobias would constitute excessive force in violation of the Fourth Amendment. Moreover, there can be no doubt that Mr. Tobias's right to be free from this type of excessive force was clearly established on July 7, 1999. Due to the significant dispute over material facts, however, we cannot award summary judgment to either party.

### E. Deliberate Indifference to Medical Needs

█ Mr. Tobias claims that the officer defendants were deliberately indifferent to

---

**20.** The *Price* court opined that Mr. Price most likely died from a cardiac arrest. *Id.* at 1240.

**21.** Under the first prong of *Saucier,* we are to view the facts in the light most favorable to Mr. Tobias. As we mentioned above, Mr. and Mrs. Tobias testified that Mr. Tobias was sober, *see, e.g.,* D. Tobias Dep. at 16:2–6, while the officer defendants testified that he was intoxicated. Under the cases just cited, it would clearly strengthen Mr. Tobias's claim

that the four-point restraint constituted excessive force if he could demonstrate that his capacity was significantly diminished, such as by proving that he was heavily intoxicated at the relevant time. For the purpose of the *Saucier* analysis, however, we refuse to view the facts in a manner that is in direct opposition to Mr. Tobias's own testimony. Therefore, for purposes of this inquiry, we accept plaintiff's assertion that he was sober as true.

his medical needs in violation of the Eighth Amendment. To prove this claim, he must show (1) that the alleged deprivation is objectively "sufficiently serious" such that there is "a condition of urgency, one that may produce death, degeneration, or extreme pain," and (2) that the officer defendant's "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety." *Hathaway v. Coughlin* 37 F.3d 63, 66 (2d Cir.1994) (quotation marks and citations omitted).

Mr. Tobias's claim fails the first prong of this test. In his complaint, he alleges injuries to his "head, neck, jaw, shoulders, back, wrists and other areas of his body." Compl. § 69(a). In his memorandum, however, he makes clear that he is only alleging deliberate medical indifference with respect to "moon-shaped cuts to his wrists caused by handcuffs that went unattended for the 7 days he was in custody" that allegedly caused nerve damage. Pl.'s Mem. at 18. He claims that he requested medical attention while in jail, and stated that he was eventually treated a few weeks later at The Hand Center, in Danbury, Connecticut. W. Tobias Dep. at 57:20–25. The doctors he saw at The Hand Center "told [him] the nerves would have to regenerate and in time [he would] get the feeling back.... They said there was nothing they could do, [and that he would recover in] time." *Id.* at 58:4–10. This is the sum and substance of his claim for deliberate medical indifference.

It is clear that Mr. Tobias's hand injuries were insufficiently serious to support a claim for deliberate medical indifference under *Hathaway.* The Hand Center's specialists made clear that there was no

"urgency," and there is no evidence that the injury could have been fatal. *Hathaway*, 37 F.3d at 66. There was no chance of degeneration, because time was deemed to be the cure. Finally, we do not believe that Mr. Tobias's injuries caused him such extreme pain as to meet his burden. He does not allege in his complaint that he suffered extreme pain, but rather just vague "physical injury." Compl. ¶ 69(a). Also, the fact that The Hand Center did not give him any medication or treatment whatsoever strongly indicates that he was not suffering from extreme pain. W. Tobias Dep. at 58:6–15. For these reasons, we find that his injuries did not rise to the level required to sustain a claim for deliberate medical indifference, and we grant the officer defendants summary judgment on this claim.

### F. First Amendment Retaliation

Finally, Mr. Tobias claims that his arrest was "plainly retaliation" for his "protected speech" aimed at the officer defendants.[22] Pl.'s Mem. at 15. His theory of retaliation is that, as the officer defendants lacked probable cause to arrest him for committing any crimes, his arrest must have been in response to the statements he made directed at the officer defendants. *Id.* As we have previously found that the officer defendants did have probable cause to arrest him for numerous crimes, his theory fails by its own terms. As he offers no evidence apart from his lack-of-probable-cause theory to support his retaliation claim, and as the officer defendants deny that they arrested him in retaliation for what he said to them, we grant the officer defendants summary judgment on this claim as well.[23]

---

22. This speech was in response to the officer defendant's request that he get in the patrol car, and may have included statements such as "Fuck you, fuck him, you don't know who you are dealing with, I am a violent mother-

fucker and if you want a piece of me, come get me." Pl.'s Mem. at 15.

23. We need not and do not consider whether his statements were actually protected by the First Amendment.

## IV. Claims Against the Balunases

In his complaint, Mr. Tobias claims that the Balunases entered into and carried out a conspiracy with the officer defendants to violate his civil rights by making false complaints against him in order to have him arrested, in violation of 42 U.S.C. § 1983. Compl. ¶¶ 3, 20, 63–65; see Dennis v. Sparks, 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (private persons who conspire with state officials act " 'under color' of law for purposes of § 1983 actions"). While the Balunases have not moved to dismiss this claim, it appears that Mr. Tobias's complaint fails to state a federal claim against them.

Mr. Tobias's complaint contains several factual allegations regarding the Balunases.[24] He claims that the Balunases made several complaints to the PCSD regarding the presence of Mr. Tobias at the cottage, even though the Balunases knew or had reason to know that his presence at the cottage was lawful. Compl. ¶ 20. Mr. Tobias also claims that the Balunases told the officer defendants that they owned the cottage and that Mr. Tobias was trespassing. Id. ¶ 22; see also Balunas Answer ¶ 7 (admitting this allegation). Even if one accepts all of these allegations as true, however, Mr. Tobias does not appear to state a claim cognizable in federal court.[25]

In short, Mr. Tobias claims nothing more than that the Balunases made a criminal complaint against him for trespassing on their property.[26] It is well settled, however, that this is insufficient to deem the Balunases to have been acting "under color" of law within the meaning of § 1983. See, e.g., Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir.1999) ("Where, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983"); Benavidez v. Gunnell, 722 F.2d 615, 618 (10th Cir.1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983. The mere furnishing of information to police officers

24. The Complaint also makes at least one legal conclusion with regard to the Balunases. See Compl. ¶ 63 (alleging that the Balunases and the officer defendants "engaged in a joint venture, acting together and in concert, sanctioning and condoning the wrongful actions being taken by each of the Defendants in a collective manner ... to ... violate [Mr. Tobias's] constitutional and statutory rights"). Legal conclusions such as this do not bear on the issue of whether a complaint states a cognizable claim. Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998).

Furthermore, several of the allegations in the Complaint are no longer relevant, as they refer solely to actions taken by the Balunases with respect to the withdrawn claims of Mrs. Tobias. See Compl. ¶ 64–65.

25. The discovery obtained in this case, moreover, indicates that this is an accurate description of the Balunases' role in the events at issue here. Notably, there is no evidence that the Balunases were closer than fifty yards away from Mr. Tobias at any time after they called the PCSD on July 7, 1999.

26. Viewing Mr. Tobias's complaint charitably, he alleges that the trespass complaint made by the Balunases was malicious because Mrs. Tobias had the right to permit or exclude anyone she wanted from the cottage, she had invited Mr. Tobias there, and the Balunases were aware of these facts. See Pl.'s Mem. at 7–8. What Mr. Tobias ignores, however, is that the Balunases relationship with Mrs. Tobias was not of the traditional landlord-tenant variety, but, rather, was closer to a contractual relationship, in that her "right" to live in the cottage was a component of her salary. Under these circumstances, it could readily be concluded that it was reasonable for the Balunases to place conditions on her use of the cottage, such as prohibiting visits from Mr. Tobias. Accordingly, the Balunases could reasonably believe that Mr. Tobias was trespassing even though Mrs. Tobias had invited him to the cottage.

does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985."); *Butler v. Goldblatt Bros., Inc.,* 589 F.2d 323, 327 (7th Cir.1978) (granting summary judgment to private party defendant who "did [nothing] more than supply information to police officers who then acted on their own initiative in arresting [plaintiff]; and we decline to hold that the mere act of furnishing information to law enforcement officers constitutes 'joint (activity) with state officials' "). Hence, the facts he alleges in his complaint appear not to state a claim under § 1983.

Nevertheless, as the Balunases have not moved for summary judgment, and, as we are cognizant that the Second Circuit has "discouraged the practice" of a district court granting summary judgment against a moving party without notice or an opportunity to defend. *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 139 (2d Cir.2000). Accordingly, we direct plaintiff to submit a letter brief by April 5, 2002, explaining any legal or factual arguments that we have overlooked that would support the maintenance of federal claims against the Balunases. We are not requesting a submission with respect to the viability of any state law causes of action that Mr. Tobias has asserted against the Balunases.

## V. Claims Against the County

Finally, Mr. Tobias claims that the policies and practices of the County violated his First, Fourth, and Fourteenth Amendment rights. Compl. ¶ 78. In *City of Canton v. Harris,* the Supreme Court held that

a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983. It is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983.

489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (citations and internal quotation marks omitted).

We have already determined that Mr. Tobias suffered no constitutional deprivations, with the possible exception of his right to be free from excessive force. Although his Complaint alleges a litany of unconstitutional policies and practices, *see* Compl. ¶ 68, Mr. Tobias relies solely on two "unwritten polic[ies]" in his memorandum. Pl.'s Mem. at 13.

■ The first allegedly unconstitutional County policy is one that "permits deputy sheriffs to entertain complaints of questionable legal validity [that they] know or have reason to know are not legally sustainable offenses, and to act upon them to make arrests." *Id.* Mr. Tobias puts forth two pieces of evidence in support of this claim. First, he offers the claimed fact that Mr. Tobias himself was arrested without probable cause. We have already determined, however, that the officer defendants did, in fact, have probable cause to arrest him. Second, he points to Deputy Sheriff Velotti's deposition testimony stating, "The policy of our department is if somebody wants to file a complaint that we would take the complaint." Velotti Dep. at 29:2–4. In the absence of some evidence that the County permits its officers to make arrests without probable cause, we find that a policy that civilians are permitted to file criminal complaints against each other does not offend the Constitution.

The second challenged County policy is one that permits the use of the four-point restraint. As we have already determined that use of the four-point restraint is not *per se* unconstitutional, *see* Part III.D.2.b, *supra,* this claim fails. Even assuming,

arguendo, that use of the four-point restraint is always unconstitutional, there is no evidence that the County mandates or encourages its officers to use it. *See* Velotti Dep. at 9:12–17 (not in PCSD's rules and regulations); Cargain Dep. at 7:20–24 (no one with the PCSD ever advised him to use the four-point restraint); Meyer Dep. at 32:7–23 (while he was trained in how to use the four-point restraint at the police academy, it is not referred to in any PCSD literature). Accordingly, we grant summary judgment to the County on all claims against it.

### CONCLUSION

In summary, we grant summary judgment to the County of Putnam on all claims against them, and we grant summary judgment to the Deputy Sheriffs Velotti, Cargain, and Meyer on all claims against them, save the excessive force claims arising out of their attempts to handcuff Mr. Tobias and carry him to the patrol car, as discussed above. Mr. Tobias is directed to submit a letter brief to the Court with respect to his federal claims against the Balunases by March 29, 2002. A pretrial conference will be held on April 12, 2002, at 1:00 p.m. in Courtroom 21A, 500 Pearl Street.

**IT IS SO ORDERED.**