# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GARY BLANKENHORN,
              *Plaintiff-Appellant,*

        v.

CITY OF ORANGE; ANDY ROMERO;
DUNG NGUYEN; GARRETT ROSS;
TAMARA SOUTH; GRAY, Sergeant;
MONTANO, Officer; KAYANO,
Officer; ROMAN, Officer,
           *Defendants-Appellees.*

No. 04-55938

D.C. No.
CV-02-01160-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
March 6, 2006—Pasadena, California

Filed May 8, 2007

Before: M. Margaret McKeown and Marsha S. Berzon,
Circuit Judges, and Samuel P. King,* District Judge.

Opinion by Judge King;
Partial Concurrence and Partial Dissent by Judge Berzon

*The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

**COUNSEL**

Paul L. Hoffman and Michael S. Morrison, Schonbrun DeSimone Seplow Harris & Hoffman, Venice, California, for the appellant.

M. Lois Boback, Woodruff, Spradlin & Smart, Orange, California; and David A. De Berry, City Attorney, City of Orange, Orange, California, for the appellees.

**OPINION**

KING, District Judge:

In July 2001, police officers from the City of Orange ("City") found Gary Blankenhorn ("Blankenhorn") at a shop-

ping mall where, six months before, he had been evicted and permanently banned from entering again. The officers arrested Blankenhorn on suspicion of trespass, and he was later charged with disturbing the peace, trespass, and three counts of resisting arrest. The prosecutor also added a gang-related enhancement charge. After Blankenhorn had spent three months in jail, all charges were dropped and he was released.

Blankenhorn then brought this civil rights suit against Defendants under 42 U.S.C. § 1983 for unlawful arrest, excessive force, and malicious prosecution; and under California state law for false imprisonment, negligence, assault and battery, and intentional infliction of emotional distress. Blankenhorn alleges that the police officers did not have probable cause to arrest him and that they used unreasonable force during the arrest by gang-tackling him, punching him, and using hobble restraints. He also seeks damages from the City and Chief Andy Romero ("Romero") on theories of municipal and supervisorial liability.

The district court granted Defendants' motion for summary judgment on all of Blankenhorn's causes of action, and Blankenhorn timely appealed. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

I.

On February 4, 2001, a security guard at The Block at Orange ("The Block" or "mall"), a shopping mall, issued Blankenhorn a "Notice Forbidding Trespass" and asked him to leave the premises. The Notice stated: "You are hereby notified that you are FORBIDDEN TO TRESPASS or enter upon my lands or buildings thereof . . . Failure to comply with this NOTICE shall result in your prosecution for TRESPASS-ING." Sergeant Jeff Gray ("Gray") was at The Block when Blankenhorn was ejected on February 4, 2001, but did not

actually see mall security issue the notice. Gray was, however, "aware that Gary Blankenhorn had been ejected from The Block at that time and was provided notice that he was not to return."

Sometime around the first week of July 2001, Officer Garret Ross ("Ross"), heard a radio report of a gang fight at The Block and, shortly afterward, saw Blankenhorn running from the area. Ross stopped Blankenhorn, they sat down together, and Ross asked Blankenhorn what he knew about the fight. Ross found Blankenhorn "completely calm" and "cooperative" throughout the interview.

About midnight on July 28, 2001, Gray saw Blankenhorn in a crowd at The Block. He could not remember Blankenhorn's name but believed he had previously received a Notice Forbidding Trespass. Gray asked Officer Dung Nguyen ("Nguyen") to help him locate Blankenhorn so they "could talk to him, identify him and determine whether The Block security wished to have him removed or take some other action." In Nguyen's police report, Nguyen stated that Gray told him that Blankenhorn is a "known 18th Street gang member and had been banned from the Block facility in February 2001." A short time later, Nguyen and Gray spotted Blankenhorn, who was talking with Victor Garcia ("Garcia") and Garcia's younger brother. A video[1] taken by a mall security camera shows that there was another young boy there as well.

---

[1]A pole in the foreground of the video obstructs much of the encounter between Blankenhorn and the officers. Furthermore, the video has no audio. As a result, the video is of only limited assistance in determining what happened during the encounter between Blankenhorn and the defendant police officers. Not surprisingly, given these limitations, the parties draw different inferences from the video regarding what actually occurred during the incident. Because our review is of the district court's grant of summary judgment in favor of the Defendants, we draw all reasonable inferences that can be drawn from the video in Blankenhorn's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that on summary judgment "the drawing of legitimate inferences from the facts are jury functions, not those of a judge" and "all justifiable inferences" must be drawn in favor of the non-movant).

The parties dispute certain incidents that occurred during this initial encounter. In his police report, Nguyen claims that he immediately told Blankenhorn he was being "detained for trespassing." In his declaration supporting the motion for summary judgment, Nguyen claims he explained to Blankenhorn that "he was being stopped so that we could determine his identity and confirm with security whether or not he was allowed at the location." Nguyen also says in his police report that, because Blankenhorn had a prior conviction for robbery and was a known member of the 18th Street Gang, he asked Blankenhorn if he was carrying any weapons.

Blankenhorn's version of the initial encounter is quite different. He alleges that Nguyen, standing about fifteen feet away, yelled for him to come over because he wanted to talk to him. Blankenhorn asked why, but Nguyen did not respond. Blankenhorn then said, "I'm having a conversation with a friend, you rudely interrupt me, what's wrong with you, you don't have any manners?" When Blankenhorn continued talking with Garcia, Nguyen simply stared at them. Finally, Blankenhorn said, "What's up? You want to talk to me[,] come over here, talk to me, then." Nguyen asked him what he was doing. Blankenhorn said he was talking to a friend and asked if Nguyen had any more questions. When Nguyen did not respond, Blankenhorn tried to walk away. Nguyen then got in front of him and put his hands out to prevent him from leaving. Blankenhorn asked Nguyen why he could not leave, but Nguyen again did not respond. When Blankenhorn tried to walk around Nguyen, he grabbed Blankenhorn by the arm. When Blankenhorn, by his own admission, "yanked out of [Nguyen's] grasp," the officer threatened to spray him with mace.

A security guard employed by The Block, Trevor Medlin ("Medlin"), joined Nguyen and Gray shortly after the initial stop. Although the parties' statements do not make clear exactly when he arrived, Medlin is already at the scene when the video of the encounter begins. A short time after the video

begins, another officer, Detective Tamara South ("South"), appears on the scene. South came in response to Gray's request for back-up.

The parties characterize Blankenhorn's conduct before being taken into custody somewhat differently. Gray, Nguyen, and South described Blankenhorn as rude, uncooperative, and verbally abusive during the initial encounter. Blankenhorn admits he was "angry" and "loud," that he used profanity, and that, in frustration, he threw his driver's license on the ground. Both Nguyen's and Ross's police reports state that Blankenhorn took a fighting stance and clenched his fists. South's report says Blankenhorn several times approached Nguyen "in a threatening manner." Blankenhorn denies this. The video shows Blankenhorn gesture several times by raising his arms above his head and touching his chest. It also shows him approach Nguyen and once point at him. But it does not show Blankenhorn clench his fists. South also claimed in her police report that during the stop Blankenhorn yelled out he was a member of the 18th Street Gang. Blankenhorn and Garcia deny Blankenhorn ever identified himself as a gang member.

The parties also dispute how the officers made the arrest. Nguyen's declaration states that he asked Blankenhorn to kneel down so he could handcuff him. Blankenhorn refused, saying, "I'm not going to my f***ing knees." Blankenhorn alleges that, immediately after he said this, Nguyen, Ross,[2] and South "all jumped on [him]," though all three officers and Gray maintain that Nguyen first reached for Blankenhorn's left wrist to place him in handcuffs. The video shows the officers and Blankenhorn struggling for several seconds before the officers finally take him to the ground. Blankenhorn was

---

[2]The video shows that Ross arrived on the scene and stood behind Blankenhorn just seconds before the officers attempted to take him into custody. It is not clear from the video whether Ross heard Nguyen's request to kneel or Blankenhorn's response.

handcuffed. Once this was accomplished, Gray ordered Ross to secure his wrists and ankles with ripp-hobble restraints, and Ross did so.[3]

Blankenhorn claims that, during the struggle, Nguyen punched him several times, and another officer or officers placed a knee behind his neck and pressed his face to the ground. The video clearly shows Nguyen punch Blankenhorn in the head and twice more in the side. Nguyen landed at least one punch to Blankenhorn's body after Blankenhorn was already on the ground. Though Nguyen, South, and Ross fail to mention the punches in their police reports, they all reported that Blankenhorn resisted being handcuffed by maneuvering his hands and arms under his body. Blankenhorn denies he ever did this. It is not clear from the video whether Blankenhorn so maneuvered.

Blankenhorn was charged by information on September 17, 2001, with one count of trespass, three counts of resisting arrest, and one count of disturbing the peace. The trespass was charged as a misdemeanor, but the resisting arrest and disturbing the peace counts were charged as felonies due to a gang-related enhancement.[4] At the preliminary hearing, Nguyen admitted that, though he did not mention it in his police

---

[3]Officers Kayano ("Kayano") and Montano ("Montano") arrived during the struggle. Upon seeing the other officers trying to tackle Blankenhorn, Kayano ran over to the pile and grabbed and held Blankenhorn's left arm so it could be handcuffed. Though Kayano stated in his declaration that he could not remember whether he or Nguyen actually placed the handcuffs on Blankenhorn's left wrist, Kayano was certain that the handcuffs used were his own. Montano helped with crowd control. Officer Paul Roman ("Roman") arrived on the scene after Blankenhorn was already subdued.

[4]California law provided at the time of Blankenhorn's arrest for the imprisonment of "[a]ny person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of or in association with, any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members." CAL. PEN. CODE § 186.22(d) (West 1999 & Supp. 2001).

reports, he punched Blankenhorn several times when making the arrest. The deputy district attorney, Sonia Balleste ("Balleste"), later decided to dismiss all charges against Blankenhorn because she believed Nguyen's admission at the preliminary hearing would damage his credibility as a witness and "cause enough of a concern in a jury's mind to raise a reasonable doubt." By that time, however, Blankenhorn had already spent three months in jail.

## II.

A grant of summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Likewise, a grant of summary judgment on the ground of qualified immunity is also reviewed de novo. *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

We may not affirm a grant of summary judgment if there is any genuine issue of material fact or the district court incorrectly applied the substantive law. *See Olsen*, 363 F.3d at 922. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when reviewing a grant of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.

A.  Blankenhorn's Causes of Action Under § 1983.

1.  Unlawful Arrest.

Blankenhorn claims that his arrest violated his Fourth Amendment rights. A warrantless arrest of an individual in a

public place for a crime committed in an officer's presence violates the Fourth Amendment if the arrest is not supported by probable cause. *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Defendants seek qualified immunity from this claim.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Defendants are entitled to such relief only if the facts alleged and evidence submitted, resolved in Blankenhorn's favor and viewed in the light most favorable to him, show that their conduct did not violate a federal right; or, if it did, the scope of that right was not clearly established at the time. *See, e.g.*, *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004).

Absent unusual circumstances, the analysis proceeds by first concentrating on whether there was a constitutional violation. Even if it might be easier analytically to address whether the scope of the right was "clearly established," we are to decide the constitutional question first. *See Motley v. Parks*, 432 F.3d 1072, 1077-78 (9th Cir. 2005) (en banc); *see also Meyers v. Redwood City*, 400 F.3d 765, 770 (9th Cir. 2005).

Thus, we first address whether Defendants violated Blankenhorn's Fourth Amendment Rights. If no violation is found, Blankenhorn cannot prevail. On the other hand, if there is a violation (or if there is a triable question of fact in that regard), then we must determine whether that constitutional violation was clearly established at the time. "Finally, even if the violated right was clearly established, the *Saucier* court recognized that it may be difficult for a police officer fully to appreciate how the legal constraints apply to the specific situation he or she faces. Under such a circumstance, '[i]f the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense.' " *Motley*, 432

F.3d at 1077 (quoting *Saucier*, 533 U.S. at 205) (alteration in original).

a. Officers had Probable Cause to Arrest.

**[1]** "A police officer may make a warrantless arrest when the 'officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed.' " *Peng v. Mei Chin Penghu*, 335 F.3d 970, 976 (9th Cir. 2003) (quoting Cal. Penal Code § 836(a)(3) (West 2003)). In California, "an officer has probable cause for a warrantless arrest 'if the facts known to him would lead a [person] of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' " *Id.* (citing *People v. Adams*, 221 Cal. Rptr. 298, 301 (Cal. Ct. App. 1985)). Federal standards are consistent: "The test for whether probable cause exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.' " *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (citation omitted), *cert. denied*, 126 S. Ct. 1664 (2006).

**[2]** "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) (citation omitted). "When there has been communications among [officers], probable cause can rest upon the investigating [officers'] 'collective knowledge.' " *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990) (citation omitted).

"Because probable cause must be evaluated from the perspective of 'prudent [people], not legal technicians,' an officer

need not have probable cause for every element of the offense. However, when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (citations omitted).

We focus on trespassing. Although Blankenhorn was also arrested for resisting arrest under California Penal Code section 148(a), any such resistence (and corresponding probable cause) arose out of the initial arrest for trespassing. If there was no probable cause to arrest Blankenhorn for trespassing in the first place, it makes no difference for present purposes if he resisted arrest. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001) ("If the officers could not lawfully arrest [a person] for battery, the officers could also not lawfully arrest [the person] for resisting arrest.") (citing *In Re. Manuel G.*, 941 P.2d 880, 885 (Cal. 1997)); *see also People v. Simons*, 50 Cal. Rptr. 2d 351, 355 (Cal. Ct. App. 1996) ("Defendant cannot be convicted of an offense against an officer engaged in the performance of official duties unless the officer was acting lawfully at the time. 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful.' ") (quoting *People v. Gonzalez*, 800 P.2d 1159, 1176 (Cal. 1990) (internal citation omitted)).

Blankenhorn was forbidden from entering The Block. To reiterate, he was issued a "Notice Forbidding Trespass" stating: "You are hereby notified that you are FORBIDDEN TO TRESPASS or enter upon my lands or buildings thereof . . . Failure to comply with this NOTICE shall result in your prosecution for TRESPASSING." He knew he was banned by The Block. Officer Gray saw Blankenhorn and knew or thought he had previously been banned by the owner. Gray (and other officers) knew Blankenhorn was somehow associated with the

"18th Street" gang.[5] Gray and Nguyen then stopped Blankenhorn, sought identification to confirm whether or not he had previously been banned, and events escalated. Officers were seeking an indication from The Block's management or security as to whether The Block wanted him removed, or had actually been told by security that The Block wanted him arrested for trespassing. And security guard Medlin did issue (although immediately after the incident) a written citizen's arrest statement form indicating Blankenhorn was trespassing and demanding officers "receive custody of [Blankenhorn] pursuant to Penal Code Sections 847, 849 and 142."[6]

Given those facts, Defendants had probable cause to believe Blankenhorn was trespassing and that The Block would want to prosecute or have him removed. Defendants (Gray and Nguyen in particular) could have "conscientiously entertain[ed] an honest and strong suspicion that [Blankenhorn] [was] guilty of a crime." *Peng*, 335 F.3d at 967. That is, "under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe" Blankenhorn was trespassing." *Dubner*, 266 F.3d at 966.

Blankenhorn was arrested for a suspected violation of California Penal Code section 602(j)[7] [now section 602(k)] but

---

[5]Blankenhorn does not deny he was, at least at some point, a gang member; he testified that he "repeatedly told [police] '[a]t one point in time I was [a gang member]. [But] I'm not doing that no more.' " There is no disputed evidence to contradict various officers' declarations and testimony that Blankenhorn was known to officers to be (or have been) a gang member on July 28, 2001, when he was arrested. (Officer South indicated that she heard Blankenhorn yell in a loud voice at Nguyen and Gray on July 28, 2001, that he was an "18th Street" gang member; Blankenhorn and another witness, however, denies that he said that at the time.)

[6]Other evidence in the record indicates that Blankenhorn had been disruptive earlier in the evening and had been ejected from a restaurant at The Block. There is no indication, however, that officers knew about this incident before or at the time of the arrest.

[7]When Blankenhorn was arrested, section 602(j) made it a misdemeanor trespass to "[e]nter[ ] any lands, whether unenclosed or enclosed by fence,

ultimately charged with violating section 602(n) [now section 602(o)].**8** It doesn't matter for present purposes if he was charged with a different crime than that for which he was arrested. "[P]robable cause may exist for an arrest 'for a closely related offense, even if that offense was not invoked by the arresting officer, as long as it involves the same conduct for which the suspect was arrested.' " *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th Cir. 2003) (citation omitted). "As long as the officers had some reasonable basis to believe [Blankenhorn] had committed a crime, the arrest is justified as being [ ] based on probable cause. Probable cause need only exist as to any offense that could be charged under the circumstances." *Id.* at 952 (quoting *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)).

**[3]** Under then-section 602(j), reasonable officers could have concluded that Blankenhorn — known to be (or have been) a gang member who had previously been banned a few

---

for the purpose of injuring any property or property rights or with the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by the owner of the land, the owner's agent or by the person in lawful possession." CAL. PEN. CODE § 602(j) (West 1999 & Supp. 2001).

**8**When Blankenhorn was arrested, in relevant part section 602(n) made the following action a misdemeanor trespass:

> Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) the owner, the owner's agent, or the person in lawful possession. The owner, the owner's agent, or the person in lawful possession shall make a separate request to the peace officer on each occasion when the peace officer's assistance in dealing with a trespass is requested.

CAL. PEN. CODE § 602(n) (West 1999 & Supp. 2001).

months earlier — could have returned either "for the purpose of injuring any property or property rights" or "with the intention of interfering with, obstructing, or injuring any lawful business." Reasonable officers could have thought that Blankenhorn, knowing he had been banned a few months earlier, could have intended that his presence would constitute "injury to property rights" or "interference" with The Block's business.

**[4]** Alternatively, a reasonable officer could conclude that Blankenhorn's conduct satisfied the elements under section 602(n). His return to The Block constituted a "[r]efus[al] or fail[ure] to leave" after being issued the Notice Forbidding Trespass. While a shopping center, under California law, is generally "open to the public," the Notice Forbidding Trespass arguably rendered The Block "not open to the public" with respect to Blankenhorn. *Cf. Picray v. Sealock*, 138 F.3d 767, 772 (9th Cir. 1998) (discussing a similar requirement in an Oregon trespassing statute and recognizing that "premises are not considered 'open to the public' with regard to a particular individual when that person previously has been barred from the property."). And the Notice Forbidding Trespass issued to Blankenhorn could constitute at least part of a "request to leave" under section 602(n).

Section 602(n) requires a "separate request to the peace officer [by the owner] on each occasion when the peace officer's assistance in dealing with a trespass is requested" and the undisputed facts indicate Defendants gave The Block a chance to fulfill this requirement and that it was fulfilled. Nguyen declared that "I tried to explain to Blankenhorn that he was being stopped so that we could determine his identity and confirm with security whether or not he was allowed at the location . . . . Block security confirmed that Mr. Blankenhorn had previously been banned from the Block and that they wished to place him under arrest for trespassing." Similarly, Gray indicated that they were determining "whether Block security wished to have [Blankenhorn] removed or take some

other action" and that "security further confirmed that they wished to place Mr. Blankenhorn under arrest for trespassing. . . . Block security then advised Mr. Blankenhorn that he was under arrest for trespassing."

As it turns out, upon close parsing of the statutory language and California case law, it appears an actual conviction for trespass might have been difficult without additional evidence. The California Penal Code does not define "injury to property" nor "interfer[ence] with" any lawful business as those terms are used in section 602(j). Rather, section 602(j) is to be interpreted "according to its general usage." *People v. Harris*, 12 Cal. Rptr. 916, 919 n.4 (Cal. Ct. App. 1961). In a criminal context under California law, "[t]he word 'interfere' is a word of 'well recognized, defined meaning.' . . . It imports to 'disarrange,' 'disturb,' or 'hinder.' " *People v. Agnello*, 66 Cal. Rptr. 571, 574 (Cal. Ct. App. 1968) (citations omitted). A fact-finder could certainly infer that Blankenhorn was at The Block deliberately and that he knew his presence was not welcome. But it might be more difficult to prove such a deliberate presence was intended to "injure property rights" or "interfere" with its business. *Compare In re Ball*, 100 Cal. Rptr. 189, 193 (Cal. Ct. App. 1972) (concluding that the requisite intent under section 602(j) could be inferred from the defendant "deliberately entering [a Disneyland] parking lot *and* engaging in the conduct disclosed after having requested and been denied permission to do so *and* from his refusal to leave when asked to do so.") (emphases added).⁹

---

⁹Blankenhorn's reliance upon *In re Wallace*, 475 P.2d 208 (Cal. 1970) (In Bank), for the proposition that criminal intent cannot be inferred merely from Blankenhorn's return to The Block is misplaced. In that case, three protesters were asked by a deputy sheriff to leave a county fair but returned two hours later to resume their leafletting. *Id.* at 212. When asked a second time to leave, the protesters refused and were arrested for trespassing. *Id.* The only evidence that the protesters had been obstructing business at the fair was the deputy sheriff's testimony that he informed them they would be arrested "if they did not cease their obstruction of the pathway." *Id.* The court held that the officer's testimony "establishe[d]

Likewise, actually convicting under section 602(n) might have been difficult. It is undisputed that Blankenhorn was not asked to leave the premises on that night (i.e., other than the Notice Forbidding Trespass issued in February of 2001). Although the statute does require a "request to leave," it does not specifically provide that the request must be contemporaneous. (The statute specifically requires a "separate request to the peace officer on each occasion when the peace officer's request in dealing with a trespass is required," but the statute does not provide that a specific request is required "on each occasion" to the accused trespasser.) But a version of the statute has been interpreted to require "dual requests to leave, one from a peace officer, the other from the property possessor." *People v. Medrano*, 144 Cal. Rptr. 217, 227 (Cal. Ct. App. 1978), *disapproved of on other grounds*, *Vista Verde Farms v. Agricultural Relations Bd.*, 625 P.2d 263 (Cal. 1981). In any event, Defendants appear to concede that Blankenhorn should have been asked to leave that night before he could be convicted under 602(n).

Ultimately, however, our inquiry is not whether Blankenhorn *was* trespassing. Rather, it is whether a reasonable offi-

---

only the content of his admonition to [the protesters], not the fact of actual obstruction." *Id.* Finding that the protesters "were not in fact arrested because of any physical 'obstruction' they may have caused, but simply because they insisted on their lawful right to distribute leaflets," the court overturned the conviction. *Id.* Thus, *In re Wallace* does not stand for the proposition that criminal intent sufficient to support probable cause for a trespass arrest cannot be inferred from the arrestee's return to property after previously being told to stay away. Rather, it holds that a conviction under § 602(j) without evidence of actual interference or obstruction is invalid.

Unlike in *In re Wallace*, there is undisputed evidence of possible interference in Blankenhorn's case. There's no indication Blankenhorn was distributing leaflets or the like. Blankenhorn had been banned and Medlin was required to leave his duties at the security station to find Blankenhorn and, once again, usher him off the premises. Whether these facts alone would suffice to convict under § 602(j), they would justify a reasonable officer in believing that Blankenhorn was trespassing.

cer had probable cause to think he could have been. *See, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Peng*, 335 F.3d at 976 ("A police officer may make a warrantless arrest when the 'officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed.'") (citation omitted); *cf. Tobias v. County of Putnam*, 191 F. Supp. 2d 364, 374 (S.D.N.Y. 2002) ("Whether or not the criminal trespassing charge would have led to an indictment or a conviction is of no moment. It is sufficient for the officer defendants to show that they had arguable probable cause to believe that [the section 1983 plaintiff] was committing a trespass.").

**[5]** As we have discussed, given (1) the prior "Notice Forbidding Trespass" and other facts known to the officers, and (2) The Block security's request that police place Blankenhorn under arrest, it was reasonable for officers to believe they had probable cause to arrest Blankenhorn for trespassing.

b. The Law Was Not Clearly Established.

Moreover, even absent probable cause (or if there were a factual issue as to whether probable cause existed), Defendants are entitled to qualified immunity under the second part of the *Saucier* analysis. Because probable cause is a complex question here, it is appropriate to proceed past the threshold question. *See Meyers*, 400 F.3d at 770 ("Although we conclude that the Defendants did not violate the constitutional rights of the Plaintiffs, given the complexity of the question, we address the easier question of qualified immunity as well.").

**[6]** "[E]ven absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information the searching officers possessed." *Peng*, 335 F.3d at 980. "Whether a right is 'clearly established' for purposes of qualified immunity is an

inquiry that 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' In other words, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Graves v. City of Coeur d'Alene*, 339 F.3d 828, 846 (9th Cir. 2003) (quoting *Saucier*, 533 U.S. at 201-02) (other citation omitted).

**[7]** Thus, while it was clearly established long ago that an officer may not conduct a warrantless arrest absent probable cause, our analysis must be more focused. Applied to the California trespassing statutes, as explained earlier, there is no statutory definition of "injury to property" or "interfer[ence]" with a lawful business under section 602(j). Nor does California case law make clear that returning to property after having been permanently banned cannot constitute an "injury" to property or "interference with" (or be a "disturbance"[10]), especially where a property owner specifically requests police to arrest a person.

**[8]** Similarly, there is no California case law specifically holding that a previous, relatively-recent, banishment from private property cannot serve as a requisite "request to leave" under section 602(n). What little case law there is interpreting similar issues has emerged from First Amendment or union-organizing contexts. *See, e.g.*, *In re Ball*, 100 Cal. Rptr. at 189 (upholding conviction under 602(j) where defendant was, among other things, blocking access while seeking signatures on an antipollution initiative); *Medrano*, 144 Cal. Rptr. at 224-25 (discussing balancing of free speech demands by outsiders or physical access to audiences within private property); *Hamburg v. Wal-Mart Stores, Inc.*, 10 Cal. Rptr. 3d 568 (Cal. Ct. App. 2004) (finding question of fact as to whether protesters were intentionally interfering with a business for

---

[10]*See Agnello*, 66 Cal. Rptr. at 574 ("The word 'interfere'. . . imports to 'disarrange,' 'disturb,' or 'hinder.' ").

actions in picketing and collecting signatures for a voter initiative at business premises).

**[9]** Even if a trespassing conviction ultimately might have been difficult, there was no clearly established law indicating that Blankenhorn could not have been trespassing under present circumstances. Accordingly, even if there were no probable cause (or there were a triable question of fact), the Defendants would still be entitled to qualified immunity. The "contours" of Blankenhorn's Fourth Amendment right to be free of unreasonable seizures were not clearly established so as to encompass the trespassing charges at issue under present circumstances. *See Saucier*, 533 U.S. at 201.

### 2. Excessive Force.

Blankenhorn claims the arresting officers used excessive force in violation of his Fourth Amendment rights. Defendants claim qualified immunity from this cause of action.

Although we hold that Defendants were entitled to summary judgment as to Blankenhorn's unlawful arrest claim, we are still required to determine whether, under the circumstances, the arresting officers used an unreasonable amount of force when taking Blankenhorn into custody. *See Beier*, 354 F.3d at 1064 ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa."); *see also Arpin*, 261 F.3d at 921-22 (use of force may be reasonable even in the absence of probable cause).

### a. Violation of Blankenhorn's Constitutional Rights.

**[10]** The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Neither tackling nor

punching a suspect to make an arrest necessarily constitutes excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (" 'Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers,' . . . violates the Fourth Amendment") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). But "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officers. *Graham*, 490 U.S. at 397 (internal quotation marks omitted).

To determine whether a specific use of force was reasonable, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396 (internal quotation marks omitted). Relevant factors to this inquiry include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Forrester v. City of San Diego*, 25 F.3d 804, 806 n.2 (9th Cir. 1994). When appropriate, our reasonableness determination must also make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The parties dispute some facts necessary to decide the issue of qualified immunity on excessive force. For example, Defendants allege that Blankenhorn yelled out before his arrest that he was a member of the 18th Street Gang, but Blankenhorn denies this. Also, Nguyen claims that Blankenhorn resisted being handcuffed by pinning his arms beneath his body. Blankenhorn denies he did this or that he in any other way resisted being handcuffed. Where such disputes

exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991). We must therefore make our excessive force determination by viewing the disputed facts in favor of Blankenhorn.

Six months before the arrest, mall security issued Blankenhorn a Notice Forbidding Trespass. Three weeks before the arrest, Officer Ross stopped Blankenhorn after spotting him near the scene of an alleged gang fight at The Block. Throughout the stop, Blankenhorn remained calm, and, when asked, willingly provided Ross with information about the gang fight. The night of his arrest, Blankenhorn was suspected of having committed a misdemeanor trespass. When Nguyen and Gray stopped him, he was talking with an adult friend and was accompanied by two young boys. Nguyen asked Blankenhorn what he was doing at the mall, and Blankenhorn responded that he was talking with some friends. At some point, Nguyen grabbed his arm and, when Blankenhorn pulled free, threatened to spray him with mace. Blankenhorn threw his driver's license on the ground, but he did not take a combative stance, clench his fists, or otherwise make threatening gestures. When Nguyen asked him to kneel down so he could be handcuffed, Blankenhorn refused. Almost immediately, Nguyen, Ross, and South gang-tackled him. Nguyen did not try to handcuff Blankenhorn before the three officers tackled him. Blankenhorn struggled for several moments before the officers brought him to the ground. Once on the ground, however, Blankenhorn did not attempt to prevent the officers from handcuffing him. Even so, Nguyen punched him several times, and an officer or officers pushed his face into the pavement by shoving a knee into the back of his neck. Once Blankenhorn was subdued, the officers placed hobble restraints on his ankles, which made it difficult for Blankenhorn to move and breathe.

If Blankenhorn can prove the events as set forth above, some or all of the Defendants would probably be liable for

excessive force, both in their "gang tackling," use of hobble restraints, and in Nguyen's punching of Blankenhorn. That is, there are genuine issues of material fact.

(1)   Gang Tackle.

**[11]** A rational jury could find that the use of a gang tackle by Nguyen, Ross, and South under these circumstances was unreasonable. First, the severity of the alleged crime, misdemeanor trespass, was minimal, when the only bases for suspecting that Blankenhorn was interfering with mall business were his presence at the mall, his previous banishment, his known gang association, and the attention by security that his presence required. Second, a rational jury could conclude from Blankenhorn's cooperative behavior with Ross just three weeks before his arrest, the fact that Nguyen and Gray discovered him talking casually with a friend, and the video footage of Blankenhorn's behavior during the detention, that Blankenhorn did not pose a serious threat to the officers' or others' safety. The officers' conduct during Blankenhorn's detention as captured on the video — e.g., Nguyen's standing for long periods of time with his arms folded, South's permitting Garcia to speak with Blankenhorn, the officers' failure to prevent other mall patrons from walking within a few feet of the scene — could reasonably support this conclusion. Furthermore, the pace of events could reasonably lead to the conclusion that the latitude *Graham* requires for split-second police judgments in "tense, uncertain, or rapidly evolving" situations was not warranted here. *See Graham*, 490 U.S. at 397. Finally, though Blankenhorn verbally refused to comply with Nguyen's request to kneel down, a reasonable jury could conclude from his testimony and the video that Nguyen never tried to handcuff Blankenhorn, and Blankenhorn did not actively resist being handcuffed, before Nguyen, Ross, and South gang-tackled him.

**[12]** Because a rational jury — drawing all reasonable inferences from the facts alleged — could conclude the gang

tackle was unreasonable under the circumstances, under *Saucier*, the officers' conduct violated Blankenhorn's Fourth Amendment rights.

(2) Hobble Restraints.

The video of Blankenhorn's arrest shows that Blankenhorn did not initially submit to the officers' attempts to arrest him. Rather, he struggled with them for several seconds before being tackled to the ground, where the officers eventually gained control over him. Defendants argue that Blankenhorn's resistance could have led a prudent officer to conclude that he might pose an increased risk of danger to others and that the use of hobble restraints was therefore justified as a matter of law. We disagree.

**[13]** In assessing the reasonableness of the defendant officers' use of hobble restraints after taking custody of Blankenhorn, we must balance competing concerns. On the one hand, the Fourth Amendment permits police officers to use some force to overcome resistance to being arrested. *See Graham*, 490 U.S. at 396. We agree with our sister circuit that, in some situations, the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints. *See, e.g.*, *Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997). On the other hand, a person has the "limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct." *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992) (citation omitted); *see also Arpin*, 261 F.3d at 921. Thus, we must ask whether a reasonable jury could conclude, viewing the evidence in the light most favorable to Blankenhorn, that the Defendant officers acted in bad faith or engaged in "provocative" conduct when arresting him. If so, and Blankenhorn's resistance was reasonable, a constitutional violation occurred.

**[14]** *Span* supports the conclusion that the officers acted in bad faith. *Span* held that it was not reversible error in a trial for assault on a federal officer under 18 U.S.C. § 111 to instruct the jury that a United States Marshal "who is . . . trying to arrest a person is engaged in his official duties." *Span*, 970 F.2d at 580-81. Span claimed this instruction foreclosed her defense that she had the right to resist the use of excessive force because it was essentially a directed verdict on the issue of good faith. *Id.* at 581. There was no error, and Span's defense was not foreclosed, because "[a]n officer who uses excessive force is not acting in good faith." *Id.* Under *Span*, then, our earlier holding that a reasonable jury could find the defendant arresting officers used excessive force in gang-tackling Blankenhorn precludes a finding as a matter of law that those same officers acted in good faith.

**[15]** We also conclude that the officers' precipitate actions in making the arrest could reasonably be considered "provocative." According to Blankenhorn, the arresting officers gave no warning that they were going to arrest him before gang-tackling him and later applying hobble restraints. Indeed, as the video shows, Nguyen did not even attempt to handcuff Blankenhorn before he, Ross, and South — as if by predetermined signal — simultaneously took hold of and wrestled him to the ground. The lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon Blankenhorn could reasonably be considered "provocative," triggering Blankenhorn's limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable.

As for whether Blankenhorn's resistance was itself reasonable under the circumstances, the video appears to show that he tried to stay on his feet while three officers wrestled with him and, in Nguyen's case, punched him several times. Defendants do not allege, and the video does not show, that Blankenhorn struck out at any of the officers or mall patrons. Considering the rapidity of the officers' actions and the

restrained nature of Blankenhorn's own response, a jury could conclude Blankenhorn's resistance was reasonable under the circumstances.

[16] Since a reasonable jury could conclude that Nguyen, Ross, and South acted in a provocative manner and in bad faith, and that Blankenhorn's resistance was reasonable under the circumstances, the arresting officers are not entitled to summary judgment on Blankenhorn's claim that the use of hobble restraints was excessive under the circumstances.

(3)   Punches.

Although Blankenhorn initially resisted being arrested, Nguyen's punches were not necessarily a reasonable response. Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest " 'must be balanced against the need for force: it is the *need* for force which is at the heart of the *Graham* factors.' " *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)); *see also Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("Because the officers had control over the protesters[,] it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control[.]").

[17] At the preliminary hearing, Nguyen said he punched Blankenhorn several times during the arrest because he "was trying to get Mr. Blankenhorn's arms out from underneath him and secure the handcuffs." Nguyen further testified that such punches are "utilized at times to distract an individual so that his muscles relax momentarily and then you are able to take control." But Blankenhorn claims he never pinned his arms underneath his body. (The video does not clearly show whether he did so or not.) Crediting Blankenhorn's version of the events, as we must at a summary-judgment stage, we con-

clude that a rational jury could find that if Blankenhorn did not maneuver his arms beneath his body it eliminated the need for any use of force to release them, and thus that Nguyen's punches were not reasonably justified by the circumstances as he claims.[11]

b. The Federal Rights Were Clearly Established.

"[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" at the time of the arrest. *Saucier*, 533 U.S. at 201. *Saucier*'s requirement that the plaintiff's asserted right be clearly established "does not mean that the very action at issue must have been held unlawful before qualified immunity is shed." *Wall v. County of Orange*, 364 F.3d 1107, 1111 (9th Cir. 2004). On the contrary, police officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). While no prior Supreme Court or circuit case presents facts that are "fundamentally similar" or "materially similar" to those presented here, the salient question is still whether, at the time of the encounter with Blankenhorn, "the state of the law . . . gave [defendants] fair warning that their alleged treatment of [him] was unconstitutional." *Id.*; *see also Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) ("In excessive force cases, the inquiry remains whether, 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.' ") (alteration in

---

[11]*Cf. Arpin*, 261 F.3d at 921-22 (affirming grant of summary judgment for officer on claim of excessive force in making arrest without probable cause where the officer warned plaintiff, who was denied access to a city bus when she failed to provide proper identification, that she would be arrested if she did not cooperate by showing her transit identification; the plaintiff refused; when officer attempted to make the arrest, plaintiff stiffened her arms and pulled free from the his grasp; and the officer twisted plaintiff's arm behind her and applied handcuffs).

original) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

[18] In assessing the state of the law at the time of Blankenhorn's arrest, we need look no further than *Graham*'s holding that force is only justified when there is a need for force. We conclude that this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect — especially one who had been cooperative in the past and was at the moment not actively resisting arrest — was a violation of that person's Fourth Amendment rights. This same principle would also adequately put a reasonable officer on notice that punching Blankenhorn to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation. Finally, we hold that no reasonable officer would have believed that hobble restraints on his wrists and ankles, in addition to handcuffs, were necessary to maintain control of him and prevent possible danger to passersby.

[19] Therefore, we conclude that the state of the law was "clearly established" at the time of Blankenhorn's arrest and gave the arresting officers sufficiently fair notice that their conduct could have been unconstitutional. Accordingly, Gray, Nguyen, Ross, and South are not entitled to qualified immunity as to the gang tackle and punches used while taking Blankenhorn into custody. Gray, Nguyen, Ross, South and Kayano are not entitled to qualified immunity as to the use of hobble restraints.[12]

---

[12]Defendants argue that, because Blankenhorn offered no evidence that Montano and Roman had physical contact with him, summary judgment for them was proper. Defendants also argue that, though Kayano helped handcuff Blankenhorn, summary judgment for him was proper because Blankenhorn did not allege he used excessive force in doing so.

An officer's liability under section 1983 is predicated on his "integral participation" in the alleged violation. *Chuman v. Wright*, 76 F.3d 292,

### 3. Malicious Prosecution.

**[20]** Blankenhorn seeks damages for the three months he spent incarcerated after the district attorney filed charges against him. A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports. *See Barlow*, 943 F.2d at 1136-37; *see also Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002) (finding

---

294-95 (9th Cir. 1996). " '[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd*, 374 F.3d at 780. But it does require some fundamental involvement in the conduct that allegedly caused the violation. *See id.* (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed").

Roman, who arrived on the scene after the arrest was completed, and Montano, who at most provided crowd control, did not participate in any integral way in the arrest. Therefore, summary judgment in their favor was properly granted.

Kayano's help in handcuffing the prone Blankenhorn was, of course, meaningful participation in the arrest. It is true that Blankenhorn does not claim Kayano used excessive force in handcuffing him, and Ross, not Kayano, placed the ripp-hobbles on Blankenhorn's wrists and ankles. But Kayano's own declaration indicates that his help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints. Therefore, Kayano's participation was integral to the use of the hobble restraints. *See id.*

It follows that Gray, who ordered Ross to use the hobble restraints, and Nguyen and South, who tackled Blankenhorn, also participated in an integral way in the application of the hobble restraints.

Accordingly, Gray, Nguyen, Ross, South, and Kayano may be held liable for this particular alleged use of excessive force. *See Chuman*, 76 F.3d at 294-95.

that a coroner who "deliberately lied about the autopsy in the autopsy report" could be held liable under § 1983).

Defendants claim that Nguyen, Ross, and South are entitled to immunity from damages for malicious prosecution under *Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981). *Smiddy* held that, "where police officers do not act maliciously or with reckless disregard for the rights of an arrested person, they are not liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted." *Id.* at 267. This presumption may be rebutted by showing, for example, that the prosecutor "was pressured or caused by the investigating officers to act contrary to his independent judgment" or that the investigating officers presented the prosecutor with "information known by them to be false." *Id.* at 266-67.

To overcome the presumption, Blankenhorn alleges that Nguyen provided false information in his report by not disclosing that he punched Blankenhorn; that Balleste charged him with two counts of resisting arrest based on Nguyen's and Ross's false statements that he took a combative stance and clenched his fists before being taken into custody; and that Balleste added the gang-enhancement charges against him on the basis of South's false statement that he identified himself as a gang-member.

[21] Blankenhorn's allegations do not support a finding that Gray, Montano, Kayano, Roman, and Romero were integrally involved in providing false statements to the prosecutor and thus in his allegedly malicious prosecution. *See Chuman*, 76 F.3d at 294-95. Therefore, we hold that the grant of summary judgment on this claim in favor of those defendants was proper.

The district court granted summary judgment for Nguyen on Blankenhorn's first contention because Nguyen's omission

was not material to the charges. As to Blankenhorn's second claim, the district court held, citing *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994), that inconsistencies between South's and Blankenhorn's versions of events was insufficient to rebut the presumption of prosecutorial independence. The district court did not address Blankenhorn's third allegation.

**[22]** The district court's resolution of Nguyen's failure to include the punches in his report was correct as to trespassing. Even if Nguyen purposely omitted mentioning that he punched Blankenhorn, that information was not legally relevant to whether there was probable cause to charge Blankenhorn with trespass. Consequently, Nguyen's omissions — though influential on Balleste's tactical decision to drop the charges — were not themselves the basis upon which the charges were made. Because this evidence, even if true, does not overcome the presumption of prosecutorial independence, *see Smiddy*, 665 F.2d at 266-67, we affirm summary judgment for Nguyen on this claim as to trespassing.

However, the district court's holding with regard to Blankenhorn's malicious prosecution claim against South was improper because the district court's reliance on *Sloman* was misplaced. *Sloman* held that "conclusory allegations [of falsehood], standing alone, are insufficient to prevent summary judgment" against a claim of malicious prosecution on the ground of independent prosecutorial judgment. *Sloman*, 21 F.3d at 1474. The key fact in *Sloman* was that the plaintiff "did not . . . point to any evidence of . . . fabrication, other than the fact that the officers' reports were inconsistent with [his] own account of the incidents leading to his arrest." *Id.* Blankenhorn, however, provided more than conclusory allegations of the falsehood of South's statement. Specifically, he supported his motion in opposition with Garcia's declaration that he "never heard Gary say or yell out that he was an 18th Street gang member." While Deputy D.A. Balleste may have relied at least in part on the fact that Blankenhorn "was a known 18th Street Gang member" in deciding to file the

gang-enhancement charges, Balleste stated that she relied on South's (potentially false) statement when the charges were filed. (Blankenhorn's later deposition testimony where he told police he was, or had been, a gang member was obviously not part of the charging decision.) Defendants did not provide any additional evidence to prove that Balleste's independent judgment was an intervening cause of Blankenhorn's gang-related prosecution. Blankenhorn thus provided sufficient evidence to survive *Sloman* and, in so doing, to rebut the presumption of prosecutorial independence. Therefore, we reverse the grant of summary judgment on this cause of action against South. An issue of fact remains. *See Smiddy*, 665 F.2d at 267.

Blankenhorn also claims false statements in the arrest reports filed by Ross and Nguyen led to his three resisting-arrest charges. Before filing the charges, Balleste did not look at the video, relying instead on Ross's and Nguyen's police reports, both of which state that Blankenhorn took a combative stance and clenched his fists. Thus, the information in those reports was the only basis for the resisting-arrest charges. Again, Blankenhorn submitted more than mere conclusory allegations of falsehood by submitting the declaration of a witness, Garcia, that directly contradicted the police reports. A reasonable jury drawing all justifiable inferences from the video and witness statements in Blankenhorn's favor could conclude that Blankenhorn did not act as Nguyen and Ross alleged and, thus, that the reports included intentionally false information. If so, Blankenhorn would overcome the presumption of prosecutorial independence. *See Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1989) (plaintiff overcame presumption where prosecutor had no information but police reports and plaintiff presented evidence, in addition to his own testimony, of false information in the reports); *see also Barlow*, 943 F.2d at 1137 (discussing *Borunda*).

**[23]** Moreover, Nguyen's purposeful omission that he punched Blankenhorn is relevant to whether there was probable cause to charge him with resisting arrest. If the prosecutor

knew Nguyen used excessive force, there would likely be little or no basis for charging him with resisting arrest as was done here.[13] *See People v. Olguin*, 173 Cal. Rptr. 663, 667 (Cal. Ct. App. 1981) ("[I]t has long been established that a police officer is not permitted to use unreasonable or excessive force in making an otherwise lawful arrest, and if the officer does use such force the arrestee may use reasonable force to protect himself in accordance with the principles of self-defense."); *People v. White*, 161 Cal. Rptr. 541, 544 (Cal. Ct. App. 1980) ("[I]f a defendant is charged with [resisting arrest] and the arrest is [made with excessive force], a defendant cannot be convicted of [resisting arrest].").

**[24]** We therefore hold that Ross and Nguyen are not entitled to summary judgment under *Smiddy*. Accordingly, we reverse the district court's grant of summary judgment for Ross and Nguyen on this cause of action.

4. Municipal Liability.

**[25]** Blankenhorn seeks to hold the City liable for the arresting officers' alleged use of excessive force. The City may be held liable under section 1983 if its deliberate policy caused the constitutional violation alleged. *See Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 694 (1978); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001). Because the policy Blankenhorn complains of is a failure to train, he must show that (1) he was deprived of a constitutional right, (2) the City had a training policy that " 'amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are

---

[13]Blankenhorn was charged with three counts of resisting arrest. It is impossible to discern from the record if any of these counts stem from his actions before excessive force may have been used on him. Because this case is on summary judgment, all inferences must be drawn in his favor and, consequently, his claim for malicious prosecution analyzed with respect to all three.

likely to come into contact"; and (3) his constitutional injury would have been avoided had the City properly trained those officers. *See Lee*, 250 F.3d at 681 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)).

**[26]** The evidence Blankenhorn proffered to establish the City's policy of failing to train its officers in the use of excessive force focused exclusively on Officer Nguyen. This included performance evaluations and internal affairs interviews regarding Blankenhorn's arrest as well as prior complaints against Nguyen for excessive force.

**[27]** However, evidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy. In *Alexander* we held that an executor seeking to hold a municipality liable for the testator's shooting death during a police raid of his home could not establish as a matter of law, solely on evidence of the municipality's failure to train only one officer, that the municipality had made the "deliberate" or "conscious" choice required under *Canton*. *See Alexander*, 29 F.3d at 1367. We explained that, absent evidence of a "program-wide inadequacy in training," any shortfall in a single officer's training "can only be classified as negligence on the part of the municipal defendant — a much lower standard of fault than deliberate indifference." *Id.* Because Blankenhorn has limited his proof to the City's failure to train only Nguyen, he did not meet his burden to withstand Defendants' motion for summary judgment. We therefore affirm this aspect of the grant of summary judgment in the City's favor.

5.	Supervisorial Liability.

**[28]** Blankenhorn also seeks to hold Chief Romero liable for Nguyen's alleged use of excessive force in punching Blankenhorn during the arrest. Chief Romero can be held liable in his individual capacity " 'for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation[;]

or for conduct that showed a reckless or callous indifference to the rights of others.' " *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). If Nguyen used excessive force, Chief Romero's liability as supervisor depends upon whether he " 'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.' " *Id.* (quoting *Larez*, 946 F.2d at 646).

Blankenhorn presented evidence that Chief Romero approved Nguyen's personnel evaluations despite three complaints of excessive force having been lodged against him. For the first incident (shaking an arrestee by the hair), Nguyen received a forty-hour suspension and was ordered to complete a mandatory fitness-for-duty psychological evaluation. For the second incident (ordering his dog to attack a child), which occurred while Nguyen was off-duty, he also received a forty-hour suspension. For the last one (allegedly pushing a woman in the breast during an investigatory stop), Nguyen received a departmental reprimand. Nguyen's evaluations also include several citizen commendations.

In addition to the approved evaluations, Blankenhorn presented expert testimony from Roger Clark ("Clark"), a former sergeant and lieutenant with twenty-seven years of experience in the Los Angeles County Sheriff's Department. Clark's opinion was that the Department's discipline of Nguyen in all three matters was insufficient. Clark opined that discipline for the first complaint "should have included a re-training component and a period of monitoring to make this effective discipline and for deterrence." For the second, Clark said Nguyen should have been fired. For the last complaint, Clark said that the "imposition of a written reprimand was tantamount to no discipline."

In *Larez*, the Ninth Circuit held there was no plain error in a jury verdict finding Los Angeles Chief of Police Daryl

Gates liable for his officers' use of excessive force. *See Larez*, 946 F.2d at 646. Larez presented evidence that Gates personally dismissed his excessive force complaint against the officers who searched Larez's house. *Id.* at 635. He also presented an expert witness who testified that Chief Gates should have disciplined the officers and established new procedures to avoid future similar incidents. *Id.* at 636. The expert further testified that, based on a two-year comparative study he had conducted, Los Angeles police officers almost never received discipline as a result of citizens complaints. *Id. Larez* held that on this evidence the jury could have found Chief Gates "condoned, ratified, and encouraged excessive use of force" among the officers he supervised, and thereby caused Larez's constitutional violations. *Id.* at 646.

*Watkins* is similar. Watkins, who sought damages for injuries caused by a police dog during his arrest on suspicion of burglary, charged the officer who released the dog, Chew, with use of excessive force and sought to hold Oakland Police Chief Samuels liable as well. *Watkins*, 145 F.3d at 1093. Watkins presented evidence that Samuels, without determining whether ameliorative action was called for, signed an internal affairs report dismissing Watkins's complaint against Chew despite evidence in the report of Chew's excessive force during Watkins's arrest and in other dog bite incidents. *Id.* Watkins also argued that Chief Samuels failed to establish new procedures to avoid similar injuries "despite evidence of numerous injuries to suspects apprehended by the use of police dogs." *Id.*

**[29]** While Chief Romero did not personally dismiss complaints against Nguyen, as was the case in *Larez* and *Watkins*, he did approve Nguyen's personnel evaluations despite repeated and serious complaints against him for use of excessive force. That approval, together with the expert testimony regarding the ineffectiveness of Nguyen's discipline for those complaints, could lead a rational factfinder to conclude that Romero knowingly condoned and ratified actions by Nguyen

that he reasonably should have known would cause constitutional injuries like the ones Blankenhorn may have suffered. Another genuine issue of material fact exists. Accordingly, summary judgment for Chief Romero on this issue was improper.[14]

B.   Blankenhorn's State Law Causes of Action.

Blankenhorn's suit includes state law claims against Defendants for false arrest/false imprisonment,[15] assault and battery, negligence, and intentional infliction of emotional distress. The district court granted summary judgment for Defendants on all these claims on grounds that Defendants were immune under California law.

[30] Defendants claim that they enjoy statutory immunity under California Penal Code section 847(b) from Blankenhorn's false arrest/false imprisonment claim. That statute provides that an officer cannot be held civilly liable for false imprisonment where the officer, "acting within the scope of his or her authority," made a "lawful" arrest or "had reasonable cause to believe the arrest was lawful." CAL. PEN. CODE § 847(b); *see also Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004). A California police officer is authorized by statute to make a warrantless arrest on probable cause that a person has

---

[14]If, on remand, Blankenhorn fails to establish a constitutional violation, then the question of supervisorial liability would be moot. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).

[15]In California, false arrest is a species of the tort of false imprisonment. *Collins v. City & County of San Francisco*, 123 Cal. Rptr. 525, 526 (Cal. Ct. App. 1975) ("False arrest is but one way of committing a false imprisonment."). "False imprisonment is 'the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.' " *George v. City of Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992) (quoting *Molko v. Holy Spirit Ass'n for Unification of World Christianity*, 762 P.2d 46, 63 (Cal. 1988), *cert. denied*, 490 U.S. 1084 (1989)).

committed a "public offense" in the officer's presence. CAL. PEN. CODE § 836(a)(1). Trespass is a public offense. *See* CAL. PEN. CODE §§ 15(2) & (3) (defining "public offense" as violation of the law for which a person may be, inter alia, imprisoned or fined); § 602 (enumerating misdemeanor trespasses); § 19 (providing for punishment of imprisonment or fine for misdemeanors). Because the arresting officers had probable cause to believe Blankenhorn was trespassing at The Block when he was arrested, we conclude that they were acting within the scope of their authority under California law and, therefore, that the arrest was lawful. *See* CAL. PEN. CODE § 836(a)(1); *Atwater*, 532 U.S. at 354. Accordingly, the officers are entitled to immunity from Blankenhorn's state law false imprisonment claim.

Defendants cite several other statutory provisions that, they claim, provide immunity from Blankenhorn's remaining state law causes of action. However, none of these provisions supports their claim.

**[31]** First, Defendants' argue that the arresting officers cannot be held liable for Blankenhorn's remaining state law claims under California Government Code section 820.2.[16] This provision of the California Tort Claims Act applies to police officers' discretionary decisions made during arrests. *See Price v. County of San Diego*, 990 F. Supp. 1230, 1244 (S.D. Cal. 1998); *Martinez v. County of Los Angeles*, 54 Cal. Rptr. 2d 772, 780 (Cal. Ct. App. 1996). But it has long been established that this provision does not apply to officers who use unreasonable force in making an arrest. *See Scruggs v. Haynes*, 60 Cal. Rptr. 355, 360 (Cal. Ct. App. 1967) ("[A] peace officer making an arrest is liable to the person arrested

---

[16]Section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." CAL. GOV'T CODE § 820.2

for using unreasonable force."); *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("California denies immunity to police officers who use excessive force in arresting a suspect."). Because Blankenhorn's remaining state law claims arise from the alleged use of force during his arrest, and because Gray, Nguyen, Ross, South, and Kayano are not entitled to summary judgment on Blankenhorn's unlawful force claim under § 1983, those officers are therefore not entitled to summary judgment on Blankenhorn's remaining state law claims on the ground that they are immune from liability under section 820.2.[17]

**[32]** Second, Defendants claim that California Government Code section 821.6 bars liability from Blankenhorn's remaining state law causes of action.[18] The provision's principal function is to provide relief from malicious prosecution. *See Kayfetz v. California*, 203 Cal. Rptr. 33, 36 (Cal. Ct. App. 1984). But the statute also "extends to actions taken in preparation for formal proceedings," including actions "incidental to the investigation of crimes." *Amylou R. v. County of Riverside*, 34 Cal. Rptr. 2d 319, 321-22 (Cal. Ct. App. 1994). Even so, section 821.6, as it applies to police conduct, is limited to

---

[17]For the same reason, we reject the district court's basis for granting summary judgment in Defendants's favor on Blankenhorn's intentional infliction of emotional distress claim. In their motion, Defendants claimed they were entitled to summary judgment on this cause of action because Blankenhorn could not prove as a matter of law that taking lawful custody of him was an "outrageous" act, a required element of the tort. The district court held that, since Blankenhorn did not oppose Defendants' argument, Defendants were entitled to judgment as a matter of law. However, Blankenhorn also alleges that the officers' use of *excessive force* against him was outrageous conduct. Since we cannot rule at this stage of the litigation that the arresting officers use of force was lawful, Blankenhorn's supposed failure to oppose Defendants' argument is inconsequential. Summary judgment on this claim was improper.

[18]Section 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." CAL. GOV'T CODE § 821.6.

actions taken in the course or as a consequence of an investigation. *See, e.g.*, *Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1118 (E.D. Cal. 2005). Here, the alleged tortious conduct occurred during an arrest, not an investigation. Moreover, this is not the sort of conduct to which section 821.6 immunity has been held to apply. *See, e.g.*, *Crowe v. County of San Diego*, 303 F. Supp. 2d 1050, 1120 (S.D. Cal. 2004) (interrogations and strip searches conducted during the course of a murder investigation); *Baughman v. California*, 45 Cal. Rptr. 2d 82, 89 (Cal. Ct. App. 1995) (destroying computer floppy disks during search pursuant to investigation of computer equipment theft); *Amylou R.*, 34 Cal. Rptr. 2d at 322 (taking rape and attempted murder victim against her will to the crime scene and later telling neighbors that she was lying about what happened). Because Blankenhorn's assault and battery, negligence, and intentional infliction of emotional distress claims are based on acts that allegedly happened during his arrest, not pursuant to an investigation into his guilt, section 821.6 does not confer immunity from those claims upon Defendants.

**[33]** Third, Defendants argue that the City, at least, is entitled to immunity from liability under Government Code section 815.2. That section provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." CAL. GOV'T CODE § 815.2(a). This provision clearly allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest. *See Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1348 (Cal. 1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct."). Because the City does not claim that the arresting officers were acting outside the scope of their duties, and the arresting officers are not entitled to

summary judgment on the use of unreasonable force, the City is not entitled to immunity from liability under Government Code section 815.2.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment for the City on Blankenhorn's municipal liability claim, and **AFFIRM** the grant of summary judgment for Gray, Nguyen, Ross, and South on Blankenhorn's unlawful arrest claim. We **REVERSE** the grant of summary judgment for Gray, Nguyen, Ross, South, and Kayano on Blankenhorn's excessive force claims; for Nguyen, Ross, and South on his malicious prosecution claim; and for Chief Romero on his supervisorial liability claim. We also **REVERSE** the grant of summary judgment for Defendants on all of Blankenhorn's state law claims, except the false arrest claim. We **REMAND** for further proceedings consistent with this opinion.

The parties shall bear their own costs on appeal.

BERZON, Circuit Judge, concurring in part and dissenting in part:

I am fully in accord with the majority opinion and join it, except in one respect: I disagree with the majority's holding that there was probable cause to arrest Blankenhorn. I concur rather than dissent on the false arrest issue, however, because I believe that the arresting officers are qualifiedly immune from liability for arresting Blankenhorn pursuant to California Penal Code § 602(j). My remarks are styled a dissent only because my conclusion with respect to probable cause requires me to conclude that, on the subsequent question of Blankenhorn's state law claim for false arrest, the arresting officers were not acting within the scope of their authority

under California law and thus do not enjoy statutory immunity for their actions.

## A.    *Probable Cause to Arrest*

I cannot agree with the majority's conclusion that the officers had probable cause to arrest Blankenhorn for trespassing under both section 602(n) and section 602(j) of the California Penal Code. In my view, there was probable cause under neither section.

*First*, the parties *agree* that there was no request to leave sufficient to trigger section 602(n). They do not suggest that the "Notice Forbidding Trespass" could serve as such a request. And the parties are quite right: The language of the statute explicitly requires a *contemporaneous* request for the individual to leave and, when necessary, for the assistance of a peace officer, not a notice issued weeks earlier. And, as the record is clear that on the night of his arrest Blankenhorn was never asked to leave the premises prior to his arrest nor did The Block ever ask the officers to remove him, our probable cause analysis should end there.

Instead, the majority asserts that the request to leave required by section 602(n) need not be contemporaneous with the arrest because the "on each occasion" language in the statute only applies to the property owner's request to the peace officer.[1] The statute, however, plainly indicates otherwise:

---

[1]At the time of Blankenhorn's arrest, section 602(n) read in relevant part:

> Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) the

Section 602(n) prohibits an individual from "[r]efusing or failing to leave land . . . *upon* being requested to leave." CAL. PENAL CODE § 602(n) (emphasis added). In this context, "upon" denotes a temporal relationship between the refusal and the request much more immediate than the five months that passed between the "Notice Forbidding Trespass" and the night in question. *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2518 (3d ed., 1976) (defining "upon" as "immediately following on : very soon thereafter"); THE COMPACT OXFORD ENGLISH DICTIONARY 2199 (2d ed., 1989) (defining "upon" as "[o]n the occasion of" and "[i]mmediately after, following on"). Because Blankenhorn was never asked to leave that evening, the officers lacked probable cause to believe that section 602(n) had been violated.[2]

owner, the owner's agent, or the person in lawful possession. The owner, the owner's agent, or the person in lawful possession shall make a separate request to the peace officer on each occasion when the peace officer's assistance in dealing with a trespass is requested. However, a single request for a peace officer's assistance may be made to cover a limited period of time not to exceed 30 days and identified by specific dates, during which there is a fire hazard or the owner, owner's agent or person in lawful possession is absent from the premises or property. In addition, a single request for a peace officer's assistance may be made for a period not to exceed six months when the premises or property is closed to the public and posted as being closed.

CAL. PENAL CODE § 602(n) (West 2001).

[2]Even if the timing were different, the "Notice Forbidding Trespass" hardly constituted a "request" to leave. Rather, it was essentially the equivalent of a "No Trespassing" sign tailored specifically to Blankenhorn, serving to take him out of the "public" to whom the property normally was open. The "request" requirement in section 602(n) indicates that such a posting is not enough — there also must be a contemporaneous request to leave the property before trespassing has occurred. *Cf.* CAL. PENAL CODE §§ 602(I), (k) (barring only certain actions, but not simple entry without a request to leave, "where signs forbidding trespass are displayed").

Moreover, the majority improperly considers satisfied the statutory requirement that the property owner make a "separate request to the peace officer on *each occasion* when the peace officer's assistance in dealing with a trespass is requested." CAL. PENAL CODE § 602(n) (emphasis added). Although the majority notes that "[d]efendants gave The Block a chance to fulfill this requirement and that it was fulfilled," this recitation of the facts is misleading. In fact, The Block's security communicated the desire that the police assist in removing Blankenhorn from the mall only *after* he was arrested. But the statute plainly contemplates a request to the police officer before, not after, an individual is requested to leave and then arrested for failing to do so. Moreover, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arrest officer *at the time of arrest*," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added), so the post-arrest request cannot support a finding of probable cause.

Additionally, a portion of section 602(n) *not* quoted by the majority demonstrates why the "Notice Forbidding Trespass" could not serve as the requisite request to the police officer. After the language quoted in footnote 8, the statue continues:

> However, a single request for a peace officer's assistance may be made to cover a limited period of time *not to exceed 30 days* and identified by specific dates, during which there is a fire hazard or the owner, owner's agent or person in lawful possession is absent from the premises or property. In addition, a single request for a peace officer's assistance may be made for a period *not to exceed six months when the premises or property is closed to the public and posted as being closed.*

CAL. PENAL CODE § 602(n) (emphasis added). Here, of course, the "Notice Forbidding Trespass" was issued more than 30 days earlier, there was no fire hazard or absent owner, and the

property, The Block mall, was open to the public, although not to Blankenhorn.

The majority recognizes that "actually convicting [Blankenhorn] under section 602(n) might have been difficult," but asserts that a reasonable officer could nonetheless have had probable cause to think that Blankenhorn violated the statute. Probable cause, however, cannot be established by misreading a statute. *See United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) ("[I]n this circuit, a belief based on a misunderstanding of the law cannot constitute the reasonable suspicion required for a constitutional traffic stop."); *see also United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) ("[F]ailure to understand the law by the very person charged with enforcing it is not objectively reasonable."); *United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003) (holding that a mistake of law cannot provide the "objectively reasonable grounds for reasonable suspicion or probable cause").

In sum, in the absence of a contemporaneous request to Blankenhorn to leave The Block *and* the absence of a valid request for police assistance, there is no factual basis for finding probable cause.

*Second*, with respect to section 602(j), I cannot go along with the majority's conclusion that it was reasonable for the officers to conclude that Blankenhorn intended to interfere with, obstruct, or injure the lawful business of The Block. The majority relies on a single fact to support such a finding: that Blankenhorn had been banned from The Block a few months earlier. The inference that one who enters on commercial property where one is unwanted necessarily intends to interfere with the business conducted there is too tenuous to support probable cause.

Indeed, California case law has read section 602(j) to require much more tangible indices of intent on the part of the

alleged trespasser. In *In re Ball*, 100 Cal. Rptr. 189, 193 (Cal. Ct. App. 1972), the defendant knew, because he had been told so, that the activity he wanted to engage in would interfere with Disneyland's business. Moreover, he came on the property *to* engage in the interfering activity, specifically to set up a solicitation table in the path of a passenger tram. *Id.* at 192. And interfere it did; the regular route of the passenger trams had to be diverted. *See id.* (noting that "[a]s a result of petitioner's activities, . . . [the] supervisor of Disneyland security, 'had to initiate action for the Tram to avoid the area by diverting the Tram offloading to another area'"). *In re Ball* inferred intent from *all* these circumstances — "deliberately entering the [Disneyland] parking lot *and* engaging in the conduct disclosed after having requested and been denied permission to do so *and* from his refusal to leave when asked to do so." *Id.* at 193 (emphasis added).

Applying *In re Ball* here, it is *relevant* to his intent that Blankenhorn was told not to return to The Block and did so anyhow. But his being so told cannot be *dispositive* of the question whether there is probable cause to believe that he entered The Block with "the intention of interfering with, obstructing, or injuring any lawful business" of The Block. *See* CAL. PENAL CODE § 602(j). Unlike in *In re Ball*, where the defendant came on to the property *intending* to set up a table in the middle of the parking lot, the arresting officers had no reason whatever to believe that Blankenhorn came onto the mall property *intending* that any interference with the mall's business take place. If anything, the only reasonable inference we can draw — because no facts to the contrary have been presented — is that Blankenhorn came to The Block intending that he *not* act in a manner that would draw attention; presumably he did not want to be found out and ousted or arrested.

As a result, I would hold that a prudent officer could not have concluded that there was probable cause to arrest Blankenhorn for violation of section 602(j), when all that was

known at the time of arrest was (1) he had been told he was not to return to The Block; and (2) he did so anyway.

### B.    Qualified Immunity

As discussed above, the parties agree that section 602(n) did not apply, and I find that section's language unambiguous on both the need for a contemporaneous request to leave and the need for a pre-arrest, contemporaneous request for police assistance. Consequently, I would hold that qualified immunity fails as to section 602(n).[3]

I do agree with the majority, however, that qualified immunity precludes liability with respect to arrest pursuant to section 602(j). That statute lacks the specificity of section 602(n). As the majority notes, there is little pertinent California case law construing section 602(j), and none that makes clear that returning to property after having been permanently banned from it could not constitute an intent to interfere with business.

Further, as the majority explains, there is at least one theory on which an officer could reasonably believe that such a return demonstrates the requisite intent — that the security officers at The Block would likely have spent time interacting with Blankenhorn to get him to leave. Although I do not believe that the likelihood that a security officer would have to do what he is hired to do can support probable cause of an intent to interfere with The Block's business, there is no California case law to the contrary. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 980 (9th Cir. 2003) ("Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of the clearly established law . . . ."). I therefore concur in the conclusion that there was qualified immunity with

---

[3]The fact that the defendants concede the probable cause issue as to section 602(n) further suggests that the question is not a close one.

regard to whether there was probable cause to arrest Blanken-
horn pursuant to section 602(j).

### C.   State Law False Arrest Claim

Finally, because I part ways with the majority with respect
to probable cause for arrest, it follows that I must dissent from
its conclusion that Blankenhorn's state law claim for false
arrest is precluded by statutory immunity. In California, an
officer cannot be held civilly liable in these circumstances if
he or she, "acting within the scope of his or her authority,"
made a "lawful" arrest, or "had reasonable cause to believe
the arrest was lawful." CAL. PENAL CODE § 847(b). Because I
would hold that the arrest was unlawful and, thus, not within
the scope of the officers' authority, I also would find that the
officers could not claim immunity under section 847(b).
Because I agree with the majority that no provisions provide
immunity on the other state law claims, all of Blankenhorn's
state law claims should be allowed to go forward.